Argued February 6, reversed and remanded September 6, 1974

## PHILLIPS, *Appellant, v.* KIMWOOD MACHINE COMPANY, *Respondent.*

525 P2d 1033

*David A. Vinson,* Eugene, argued the cause for

appellant. With him on the briefs were Sahlstrom, Lombard, Starr & Vinson, Eugene.

*Richard Bryson,* Eugene, argued the cause for respondent. With him on the brief were Calkins & Calkins, and Bryson & Robert, Eugene.

HOLMAN, J.

Plaintiff was injured while feeding fiberboard into a sanding machine during his employment with Pope and Talbot, a wood products manufacturer. The sanding machine had been purchased by Pope and Talbot from defendant. Plaintiff brought this action on a products liability theory, contending the sanding machine was unreasonably dangerous by virtue of defective design. At the completion of the testimony, defendant's motion for a directed verdict was granted and plaintiff appealed.

As is required in such a situation, the evidence is recounted in a manner most favorable to the plaintiff. The machine in question was a six-headed sander. Each sanding head was a rapidly moving belt which revolved in the direction opposite to that which the pieces of fiberboard moved through the machine. Three of the heads sanded the top of the fiberboard sheet and three sanded the bottom. The top half of the machine could be raised or lowered depending upon the thickness of the fiberboard to be sanded. The bottom half of the machine had powered rollers which moved the fiberboard through the machine as the fiberboard was being sanded. The top half of the machine had pinch rolls, not powered, which, when pressed down on the fiberboard by use of springs, kept the sanding heads from forcefully rejecting it from the machine.

On the day of the accident plaintiff was engaged in feeding the sheets of fiberboard into the sander. Because of the defective operation of a press, a large group of sheets of extra thickness was received for sanding. These sheets could not be inserted into the machine as it was set, so the top half of the sander was adjusted upwards to leave a greater space between the top and bottom halves to accommodate the extra thick fiberboard sheets. During the sanding of the extra thick sheets, a thin sheet of fiberboard, which had become mixed with the lot, was inserted into the machine. The pressure exerted by the pinch rolls in the top half of the machine was insufficient to counteract the pressure which the sanding belts were exerting upon the thin sheet of fiberboard and, as a result, the machine regurgitated the piece of fiberboard back at plaintiff, hitting him in the abdomen and causing him the injuries for which he now seeks compensation.

Plaintiff asserts in his complaint that the machine was defective in its design and unreasonably dangerous because (1) "it * * * could not be operated in the manner and for the purpose for which it was manufactured and sold without throwing back towards the operator panels of material being sanded * * *," and (2) "* * * it did not * * * contain * * * any guards, catches, shields, barricades or similar devices to protect the operator of said machine from being struck by panels of material thrown back out of the sanding machine * * *." The two allegations assert substantially the same thing, the first one in general terms, and the second one in particular terms. In effect, they allege the machine was defective and was unreasonably dangerous because there were no safety devices to

protect the person feeding the machine from the regurgitation of sheets of fiberboard.

While we do not here attempt to recount all of the testimony presented by plaintiff concerning the defective design of the machine, there was evidence from which the jury could find that at a relatively small expense there could have been built into, or subsequently installed on, the machine a line of metal teeth which would point in the direction that the fiberboard progresses through the machine and which would press lightly against the sheet but which, in case of attempted regurgitation, would be jammed into it, thus stopping its backward motion. The evidence also showed that after the accident such teeth were installed upon the machine for that purpose by Pope and Talbot, whereupon subsequent regurgitations of thin fiberboard sheets were prevented while the efficiency of the machine was maintained. There was also evidence that defendant makes smaller sanders which usually are manually fed and on which there is such a safety device.

It was shown that the machine in question was built for use with an automatic feeder and that the one installed at Pope and Talbot is the only six-headed sander manufactured by defendant which is manually fed. There also was testimony that at the time of the purchase by Pope and Talbot, defendant had automatic feeders for sale but that Pope and Talbot did not purchase or show any interest in such a feeder. Pope and Talbot furnished a feeding device of their own manufacture for the machine which was partially automatic and partially manual but which, the jury could find, at times placed an employee in the way of regurgitated sheets.

There was testimony that at the time defendant's employee inspected the installation of the machine purchased by Pope and Talbot, which inspection was required by their contract, the inspecting employee became aware that the machine was being manually fed. There was no testimony of any warning given by defendant of the danger concerning regurgitated sheets to a person manually feeding the machine. Neither was there any evidence that Pope and Talbot was told that the machine was built for use with a fully automatic feeder and that it was not to be fed manually, nor was the recommendation made to plaintiff's employer that if the machine was to be used without a fully automatic feeder, some sort of safety device should be used for the protection of anyone who was manually feeding the machine. There was evidence that one of Pope and Talbot's representatives was told that the top of the machine should not be raised while sanding was taking place, but there was no evidence of the danger from doing so ever being mentioned.

Defendant contends there is no proper assignment of error because, instead of being designated as an assignment of error, the claim that the trial court should not have granted a directed verdict is designated as an issue on appeal. Because plaintiff's contention upon appeal is clearly evident, we choose in this case to overlook the formal defects in his opening brief which have somewhat been alleviated by his reply brief.

In defense of its judgment based upon a directed verdict, defendant contends there was no proof of a defect in the product, and therefore strict liability should not apply. This court and other courts continue to flounder while attempting to determine how one

decides whether a product is "in a defective condition unreasonably dangerous to the user."[1] It has been recognized that unreasonably dangerous defects in products come from two principal sources: (1) mismanufacture and (2) faulty design.[2] Mismanufacture is relatively simple to identify because the item in question is capable of being compared with similar articles made by the same manufacturer. However, whether the mismanufactured article is dangerously defective because of the flaw is sometimes difficult to ascertain because not every such flaw which causes injury makes the article dangerously defective.[3]

1. The problem with strict liability of products has been one of limitation.[4] No one wants absolute liability where all the article has to do is to cause injury. To impose liability there has to be something about the

---

[1] 2 Restatement (Second) of Torts § 402A, at 347 (1965).

[2] Wade, *On the Nature of Strict Tort Liability for Products,* 44 Miss L J 825, 830 (1973) (including failure to warn as a design defect).

[3] The California Supreme Court recognized this problem and attempted to eliminate it by requiring only a defect that causes injury, and not an unreasonably dangerous defect. In Cronin v. J. B. E. Olsen Corp., 8 Cal 3d 121, 104 Cal Rptr 433, 501 P2d 1153 (1972), the court felt that requiring proof of an *unreasonably dangerous* defect would put an additional burden on plaintiff which the court deemed improper.

We, however, feel that regardless of whether the term used is "defective," as in *Cronin,* or "defective condition unreasonably dangerous," as in the Restatement, or "dangerously defective," as used here, or "not duly safe," as used by Professor Wade, the same considerations will necessarily be utilized in fixing liability on sellers; and, therefore, the supposedly different standards will come ultimately to the same conclusion. *See* Wade, *Strict Tort Liability of Manufacturers,* 19 Sw L J 5, 14-15 (1965); Wade, *supra* note 2.

[4] *Cf.* Markle v. Mulholland's Inc., 265 Or 259, 266, 509 P2d 529 (1973). Holford, *The Limits of Strict Liability for Product Design and Manufacture,* 52 Tex L Rev 81 (1973).

article which makes it dangerously defective without regard to whether the manufacturer was or was not at fault for such condition. A test for unreasonable danger is therefore vital. A dangerously defective article would be one which a reasonable person would not put into the stream of commerce *if he had knowledge of its harmful character.*[8] The test, therefore, is whether the seller would be negligent if he sold the article *knowing of the risk involved.*[9] Strict liability imposes what amounts to constructive knowledge of the condition of the product.

On the surface such a test would seem to be different than the test of 2 Restatement (Second) of Torts § 402A, Comment *i.,* of "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it." This court has used

[8] *See* Borel v. Fibreboard Paper Products Corp., 493 F2d 1076, 1088 (5th Cir 1973); Welch v. Outboard Marine Corp., 481 F2d 252, 254 (5th Cir 1973); Helene Curtis Industries, Inc. v. Pruitt, 385 F2d 841, 850 (5th Cir 1967), *cert denied,* 391 US 913, 88 S Ct 1806, 20 L Ed 2d 652 (1968); Olsen v. Royal Metals Corporation, 392 F2d 116, 119 (5th Cir 1968); Dorsey v. Yoder, 331 F Supp 753, 759-60 (Ed Pa 1971), *aff'd,* 474 F2d 1339 (3d Cir 1973).

*See generally,* P. Keeton, *Manufacturer's Liability: The Meaning of "Defect" in the Manufacture and Design of Products,* 20 Syracuse L Rev 559, 568 (1969); P. Keeton, *Products Liability—Inadequacy of Information,* 48 Tex L Rev 398, 403-04 (1970); Wade, *Strict Tort Liability of Manufacturers,* 19 Sw L J 5, 15-16 (1965).

[9] *Cf.* Welch v. Outboard Marine Corp., 481 F2d 252, 254 (5th Cir 1973). *See generally,* Wade, *supra* note 2, at 834-35; P. Keeton, *Products Liability—Some Observations About Allocation of Risks,* 64 Mich L Rev 1329, 1335 (1966).

The Wade and Keeton formulations of the standard appear to be identical except that Keeton would impute the knowledge of dangers at time of trial to the manufacturer, while Wade would impute only the knowledge existing at the time the product was sold. *Compare* P. Keeton, *Product Liability and the Meaning of Defect,* 5 St Mary's L J 30, 38 (1973), with Wade, *supra* note 3, at 15, and Wade, *supra* note 2, at 834.

this test in the past.[7] These are not necessarily different standards, however. As stated in *Welch v. Outboard Marine Corp.*,[8] where the court affirmed an instruction containing both standards:

> "We see no necessary inconsistency between a seller-oriented standard and a user-oriented standard when, as here, each turns on foreseeable risks. They are two sides of the same standard. A product is defective and unreasonably dangerous when a reasonable seller would not sell the product if he knew of the risks involved or if the risks are greater than a reasonable buyer would expect."

To elucidate this point further, we feel that the two standards are the same because a seller acting reasonably would be selling the same product which a reasonable consumer believes he is purchasing. That is to say, a manufacturer who would be negligent in marketing a given product, considering its risks, would necessarily be marketing a product which fell below the reasonable expectations of consumers who purchase it. The foreseeable uses to which a product could be put would be the same in the minds of both the seller and the buyer unless one of the parties was not acting reasonably. The advantage of describing a dangerous defect in the manner of Wade and Keeton is that it preserves the use of familiar terms and thought processes with which courts, lawyers, and jurors customarily deal.

While apparently judging the seller's conduct, the test set out above would actually be a characterization of the product by a jury. If the manufacturer was not acting reasonably in selling the product, knowing of

---

[7] *See* Markle v. Mulholland's, Inc., 265 Or 259, 266, 509 P2d 529 (1973); Cornelius v. Bay Motors, Inc., 258 Or 564, 572, 484 P2d 299, 54 ALR3d 340 (1971).

[8] 481 F2d 252, 254 (5th Cir 1973).

the risks involved, then the product would be danger-
ously defective when sold and the manufacturer would
be subject to liability.

■ In the case of a product which is claimed to be
dangerously defective because of misdesign, the process
is not so easy as in the case of mismanufacture. All the
products made to that design are the same. The ques-
tion of whether the design is unreasonably dangerous
can be determined only by taking into consideration the
surrounding circumstances and knowledge at the time
the article was sold, and determining therefrom
whether a reasonably prudent manufacturer would
have so designed and sold the article in question had
he known of the risk involved which injured plaintiff.
The issue has been raised in some courts concerning
whether, in this context, there is any distinction be-
tween strict liability and negligence.[9] The evidence
which proves the one will almost always, if not always,
prove the other.[10] We discussed this matter recently in
the case of *Roach v. Kononen/Ford Motor Co.,* 269 Or
457, 525 P2d 125 (1974), and pointed out that there is
a difference between strict liability for misdesign and
negligence. We said:

> "However, be all this as it may, it is generally
> recognized that the basic difference between negli-
> gence on the one hand and strict liability for a
> design defect on the other is that in strict liability
> we are talking about the condition (dangerousness)
> of an article which is designed in a particular way,
> while in negligence we are talking about the reason-
> ableness of the manufacturer's actions in designing
> and selling the article as he did. The article can have

[9] *See* Jones v. Hutchinson Mfg., Inc., 502 SW2d 66, 69-70
(Ky 1973).

[10] Wade, *supra* note 2, at 836-37.

a degree of dangerousness which the law of strict liability will not tolerate even though the actions of the designer were entirely reasonable in view of what he knew at the time he planned and sold the manufactured article. As Professor Wade points out, a way of determining whether the condition of the article is of the requisite degree of dangerousness to be defective (unreasonably dangerous; greater degree of danger than a consumer has a right to expect; not duly safe) is to assume that the manufacturer knew of the product's propensity to injure as it did, and then to ask whether, with such knowledge, something should have been done about the danger before it was sold. In other words, a greater burden is placed on the manufacturer than is the case in negligence because the law assumes he has knowledge of the article's dangerous propensity which he may not reasonably be expected to have, had he been charged with negligence." 269 Or at 465.

To some it may seem that absolute liability has been imposed upon the manufacturer since it might be argued that no manufacturer could reasonably put into the stream of commerce an article which he realized might result in injury to a user. This is not the case, however. The manner of injury may be so fortuitous and the chances of injury occurring so remote that it is reasonable to sell the product despite the danger. In design cases the utility of the article may be so great, and the change of design necessary to alleviate the danger in question may so impair such utility, that it is reasonable to market the product as it is, even though the possibility of injury exists and was realized at the time of the sale. Again, the cost of the change necessary to alleviate the danger in design may be so great that the article would be priced out of the market and no one would buy it even though it was of high

utility. Such an article is not dangerously defective despite its having inflicted injury.

■ In this case defendant contends it was Pope and Talbot's choice to purchase and use the sander without an automatic feeder, even though it was manufactured to be used with one, and, therefore, it was Pope and Talbot's business choice which resulted in plaintiff's injury and not any misdesign by defendant. However, it is recognized that a failure to warn may make a product unreasonably dangerous.[①] Comment *j.*, Section 402A, 2 Restatement (Second) of Torts, has the following to say:

> "In order to prevent the product from being unreasonably dangerous, the seller may be required to give directions or warning, on the container, as to its use. The seller may reasonably assume that those with common allergies, as for example to eggs or strawberries, will be aware of them, and he is not required to warn against them. Where, however, the product contains an ingredient to which a substantial number of the population are allergic, and the ingredient is one whose danger is not generally known, or if known is one which the consumer would reasonably not expect to find in the product, the seller is required to give warning against it, if he had knowledge, or by the application of reasonable, developed human skill and foresight should have knowledge, of the presence of the ingredient and the danger. Likewise in the case of poisonous drugs, or those unduly dangerous for other reasons, warning as to use may be required."

Although the examples cited in the comment do not

---

[①] *See* Borel v. Fibreboard Paper Products Corp., 493 F2d 1076, 1088-90 (5th Cir 1973). *See generally,* P. Keeton, *Products Liability—Inadequacy of Information,* 48 Tex L Rev 398, 403-04 (1970); P. Keeton, *Product Liability and the Meaning of Defect,* 5 St Mary's L J 30, 33-34 (1973).

encompass machinery or such products, it has been recognized that a piece of machinery may or may not be dangerously defective, depending on the directions or warnings that may be given with it.[19]

■ It is our opinion that the evidence was sufficient for the jury to find that a reasonably prudent manufacturer, knowing that the machine would be fed manually and having the constructive knowledge of its propensity to regurgitate thin sheets when it was set for thick ones, which the courts via strict liability have imposed upon it, would have warned plaintiff's employer either to feed it automatically or to use some safety device, and that, in the absence of such a warning, the machine was dangerously defective. It is therefore unnecessary for us to decide the questions that would arise had adequate warnings been given.

In *Anderson v. Klix Chemical,* 256 Or 199, 472 P2d 806 (1970), we came to the conclusion that there was no difference between negligence and strict liability for a product that was unreasonably dangerous because of failure to warn of certain characteristics. We have now come to the conclusion that we were in

---

[19] Hursh & Bailey, 1 American Law of Products Liability 2d, § 4.13 and cases cited therein (1974); *see* Berkebile v. Brantly Helicopter Corp., 225 Pa Super 349, 311 A2d 140, 143 (1973).

In fact, in the leading case in the area of strict liability, Greenman v. Yuba Power Products, 59 Cal2d 57, 27 Cal Rptr 697, 377 P2d 897, 13 ALR3d 1049 (1963), the California Supreme Court stated:

"* * * To establish the manufacturer's liability it was sufficient that plaintiff proved that he was injured while using the Shopsmith in a way it was intended to be used as a result of a defect in design and manufacture *of which plaintiff was not aware* that made the Shopsmith unsafe for its intended use." (Emphasis added.) 377 P2d at 901.

Thus it appears that the piece of machinery might not have been "defective" had the purchaser been made aware of its propensities through proper warnings.

error. The reason we believe we were in error parallels the rationale that was expressed in the previously quoted material from *Roach v. Kononen/Ford Motor Co., supra,* where we discussed the difference between strict liability for misdesign and negligence. In a strict liability case we are talking about the condition (dangerousness) of an article which is sold without any warning, while in negligence we are talking about the reasonableness of the manufacturer's actions in selling the article without a warning. The article can have a degree of dangerousness because of a lack of warning which the law of strict liability will not tolerate even though the actions of the seller were entirely reasonable in selling the article without a warning considering what he knew or should have known at the time he sold it. A way to determine the dangerousness of the article, as distinguished from the seller's culpability, is to assume the seller knew of the product's propensity to injure as it did, and then to ask whether, with such knowledge, he would have been negligent in selling it without a warning.

It is apparent that the language being used in the discussion of the above problems is largely that which is also used in *negligence* cases, *i.e.,* "unreasonably dangerous," "have reasonably anticipated," "reasonably prudent manufacturer," etc. It is necessary to remember that whether the doctrine of negligence, ultrahazardousness, or strict liability is being used to impose liability, the same process is going on in each instance, *i.e.,* weighing the utility of the article against the risk of its use. Therefore, the same language and concepts of reasonableness are used by courts for the determination of unreasonable danger in products liability cases. For example, see the criteria set out in

*Roach v. Kononen/Ford Motor Co., supra.*[®] The difference between the three theories of recovery is in the manner in which the decisional functions are distributed between the court and the jury. The following language, we believe, is appropriate:

"In an action for negligence it is normally the function of the jury to determine whether the defendant was negligent, subject, of course, to the authority of the judge to direct a verdict for the defendant, if he finds that the jury could not reasonably find for the plaintiff. On the other hand, in an action based on strict liability of the *Rylands* [Ryland v. Fletcher] type, for an abnormally dangerous activity, the determination as to whether strict liability will be imposed for the activity is held to be one for the judge, not the jury—for the reason that the decision involves issues of general social policy. In the products cases the courts seem not to have approached the problem in this fashion. Instead, they seem to have assumed that strict products liability is like negligence in this respect, so that a plaintiff, in order to recover, must convince the jury that the product was 'defective' or

---

[®] (1) The usefulness and desirability of the product—its utility to the user and to the public as a whole.

(2) The safety aspects of the product—the likelihood that it will cause injury, and the probable seriousness of the injury.

(3) The availability of a substitute product which would meet the same need and not be as unsafe.

(4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.

(5) The user's ability to avoid danger by the exercise of care in the use of the product.

(6) The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.

(7) The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance.

'unreasonably dangerous' or 'not duly safe,' or whatever test is used. This generally works quite satisfactorily when the question is whether the product was unsafe because of an error in the manufacturing process so that it was not in the condition in which it was intended to be. The issue then seems more factual, of the kind the jury is accustomed to handling. The difficulty comes when it is not just the single article which is to be classed as unsafe because something went wrong in the making of it, but a whole group or class or type which may be unsafe because of the nature of the design. It is here that the policy issues become very important and the factors which were enumerated above must be collected and carefully weighed [as set out in Roach v. Kononen/Ford Motor Co., *supra*]. It is here that the court—whether trial or appellate—does consider these issues in deciding whether to submit the case to the jury. If a plaintiff sues the manufacturer of a butcher knife because he cut his finger, on the sole ground that the knife was so sharp that it was likely to cut human flesh, the court would probably take the case out of the hands of the jury and not give it the opportunity to find that the knife was unsafe. Similarly with an aspirin manufacturer, when an ordinary tablet stuck to the lining of the plaintiff's stomach and caused a hemorrhage, or the manufacturer of the Pasteur treatment for rabies, when there were untoward reactions. The problem in these cases is likely to be called one of law and decided by the court. Court control of jury action is more extensive here than in the ordinary negligence action. And yet, of course, if the court decides that it would be reasonable to allow the jury to find for the plaintiff, the issue of lack of due safety will be submitted to the jury even in these cases." (Footnotes omitted.)[13]

■ It is important to point out, as indicated in the above quotation, that while the decision is made by the

---

[13] Wade, *supra* note 2, at 838-39.

court whether an activity is abnormally dangerous and strict liability of the *Rylands v. Fletcher*[18] type is to be applied, the determination of whether a product is dangerously defective and strict liability is to be applied has been treated as one primarily for the jury, similar to the manner in which negligence is determined. Therefore, the factors set forth by Wade and used in *Roach v. Kononen/Ford Motor Co., supra,* are not the bases for instructions to the jury but are for the use of the court in determining whether a case has been made out which is submissible to the jury. If such a case has been made out, then it is submitted to the jury for its determination under instructions as to what constitutes a "dangerously defective" product, much in the same manner as negligence is submitted to the jury under the "reasonable man" rule.[19]

Defendant contends that other and different instructions were given to plaintiff's employer, Pope and Talbot, and the accident occurred because these instructions were not followed and, therefore, the sander was misused and defendant is not responsible for the accident. Defendant's employee who inspected

---

[18] Fletcher v. Rylands, 3 H&C 774, 159 Eng Rep 737 (Ex 1865), *reversed in* Fletcher v. Rylands, LR 1 Ex 265 (1866), *affirmed in* Rylands v. Fletcher, LR 3 HL 330 (1868).

[19] Wade, *supra* note 2, at 834-35. Professor Wade also suggests an appropriate jury instruction which embodies the new standard. We have taken the liberty of modifying his suggestion to a form which seems to us more appropriate for use by a jury. It is as follows:

"The law imputes to a manufacturer [supplier] knowledge of the harmful character of his product whether he actually knows of it or not. He is presumed to know of the harmful characteristics of that which he makes [supplies]. Therefore, a product is dangerously defective if it is so harmful to persons [or property] that a reasonable prudent manufacturer [supplier] with this knowledge would not have placed it on the market."

the installation of the sander testified that he told Pope and Talbot's sander superintendent, as previously indicated, that the top half of the sander should not be raised while material was being run through it, and this evidence was not refuted. It is not clear from the testimony of the sander operator whether the top half of the machine was in the process of being raised at the time the accident occurred, as is contended by defendant. We believe the testimony is capable of being interpreted to the effect that when the thicker sheets caused by the press malfunction showed up, they all seemed to be of a uniform thickness, and the top of the machine was set to accommodate the extra thickness; then a number of pieces were run through before the thin piece, which had been mixed in with the thick ones, came along and was regurgitated due to the insufficient pressure exerted by the pinch rolls to offset the backward pressure of the sanding heads. In any event, we believe the testimony would permit the jury to find that whether the top had been regulated for a specific thickness of material at the time of the accident or was in the process of being raised, the accident would have occurred in either circumstance.

██ Even if the testimony is capable of the sole construction which defendant puts on it, there is no testimony that the danger of raising the top of the sander while running material through it was ever explained to Pope and Talbot,[10] and, in the absence of such an explanation, we believe the question of whether the accident occurred because the sander was dangerously defective or because it was misused was one for the

---

[10] Where a user might not realize that a minor departure from instructions may cause serious danger, an additional duty to warn of such danger arises. Noel, *Products Defective Because of Inadequate Directions or Warnings*, 23 Sw L J 256, 263 (1969).

jury and should not be decided as a matter of law, as contended by defendant.

Defendant calls to our attention that one of the principal rationales behind the imposition of strict liability upon the manufacturer for injuries caused by dangerously defective products is that the manufacturer is in the position of distributing the cost of such risks among all users of the product. Defendant then argues that in the present situation Pope and Talbot would normally bear the responsibility for the injury to its employee and that because Pope and Talbot is just as capable of spreading the cost of injury by the sale of its product as is defendant, there is no logic in imposing liability without fault upon defendant for the purpose of distributing the risk.

Defendant thus confronts us with the problem we have already been faced with in *Wights v. Staff Jennings*,[®] where we noted the difficulty of limiting the applicability of the enterprise liability theory as a basis for recovery in tort. While the enterprise liability theory may be indifferent as to whether the defendant or plaintiff's employer should bear this loss, there are other theories which allow us to make a choice.

Where a defendant's product is adjudged by a jury to be dangerously defective, imposition of liability on the manufacturer will cause him to take some steps (or at least make calculations) to improve his product. Although such inducement may not be any greater under a system of strict liability than under a system of negligence recovery, it is certainly greater than if the liability was imposed on another party simply because that other party was a better risk distributor.

---

[®] 241 Or 301, 405 P2d 624 (1965).

We suspect that, in the final analysis, the imposition of liability has a beneficial effect on manufacturers of defective products both in the care they take and in the warning they give.

The case is reversed and remanded for a new trial.