Argued December 5, 1977, reversed and remanded
for new trial January 30, petition for
rehearing denied March 2, 1979

ALLEN, *Appellant,*

*v.*

THE HEIL COMPANY et al, *Respondents.*

(TC 74-0204, SC 25103)

589 P2d 1120

Harold D. Gillis, Eugene, argued the cause for appellant. With him on the brief were Butler, Husk & Gleaves, Eugene.

William G. Wheatley, Eugene, argued the cause for respondents. With him on the brief were Jaqua & Wheatley, P.C., Eugene.

LENT, J.

**LENT, J.**

Plaintiff brought this action in strict products liability against the manufacturers[1] of a wood fiber dryer used in the fiberboard mill where plaintiff was employed. While inspecting the dryer's interior, plaintiff was burned when an explosion occurred within the dryer and flame was emitted therefrom. Plaintiff's amended complaint alleged in pertinent part:

"III

"On about November 19, 1972, Plaintiff was working in the plant dryer room. While peering through the observation port of the dryer in question, burning propane gas, wood chips and fibers belched from inside the dryer machine, through the observation port and onto Plaintiff, causing him severe burns as are later described in more detail.

"IV

"Defendants placed the dryer upon the market and sold it in a defective condition which was unreasonably dangerous to the users and consumers thereof. At the time of Plaintiff's injury, the dryer machine was being used in a reasonably foreseeable manner.

"The dryer machine was dangerously defective in one or more of the following particulars:

"a. The machine's design and manufacture did not permit persons attending the machine, to make inspections of its internal operations except through an open observation port situated in such a fashion as to subject the observer to risk of injury from fire and flames that might belch or backfire through the observation port inside the machine.

[Subparagraphs b. and c. were withdrawn by plaintiff prior to trial.]

"d. The machine's design and manufacture was such that it could not be operated in a manner in which it was intended to be operated without

---

[1] Defendant Arnold Dryer Company is a wholly owned subsidiary of defendant Heil Company. Hereinafter they will be referred to as "defendant."

causing wood chips and fibers being dried therein to ignite or explode."

The trial court granted defendant's motion for a directed verdict. On appeal from the resulting judgment for defendant, plaintiff assigns this ruling as error, and we reverse and remand for a new trial.

As agreed by the parties, this appeal involves the single issue of the sufficiency of the evidence to submit the case to the jury. In reviewing this evidence, we consider it, and all reasonable inferences therefrom, in the light most favorable to the plaintiff.

The evidence, viewed in this light, reveals that the defendant is in the business of manufacturing and selling industrial drying machines and did, in 1963 or 1964, sell a wood fiber dryer to Pope and Talbot, plaintiff's employer. The dryer, a "Heil 105," was installed by Pope and Talbot as part of their fiberboard manufacturing system. For the purposes of this appeal, the system can be described as involving wood chips or other waste wood which are cooked and ground to a desired size and shape ("geometry") under steam pressure. The wet cooked fibers are collected in a storage bin located above the dryer and are fed at a uniform rate into the dryer itself at the "head" or "front" end. At the "tail" end of the dryer there is a fan which draws air through openings around the head. The fibers are carried by the air through the revolving drum of the dryer. As the fibers pass through the length of the dryer, they are exposed to extremely high heat produced by a propane gas burner at the head of the dryer. The temperature within the dryer is above the ignition temperature of the fiber when dried, but the velocity with which the dust-like fibers travel through the dryer normally prevents ignition. At the tail end of the dryer, dried fibers are again collected, automatically weighed to check moisture content, mixed with a resin-glue,[2] and transported by conveyor

---

[2] At the time of the accident, resin was apparently added to the fibers before they entered the dryer.

belt to a press, where the mixture is formed into a mat and pressed into the finished fiberboard product.

The Heil 105 dryer was located in one of two drying rooms at the Pope and Talbot plant in the corner farthest away from the dryer operator's work area. The operator would normally approach the dryer only to make a visual inspection of the interior of the dryer. This was done through one of two observation ports located at the head of the dryer. When the Heil 105 dryer was delivered, each port consisted of a "pipe" a little more than four inches long and two and one-half inches in diameter, the outer end of which was covered by a removable cover, which was a Pyrex glass lens. Because of the design of the dryer, in particular the observation port and fitting, dust-like fibers passing through the dryer would, by an eddying effect, be deposited on the inner face of the glass, so as to require a cleaning before visual inspection could be made. This cleaning process involved unscrewing the cover, manually cleaning the glass from the inside, and replacing the cover. It took about a minute to complete this process. The purpose of making the visual observation was to inspect the flow of wood fiber into the dryer and the quality of the flame in the burner. This was usually done only once per 8-hour shift unless there had been a shutdown for some reason. A visual inspection was done after each new startup.

Because of the nature of the drying process, fires and explosions within the dryer, which in turn could cause secondary explosions in the atmosphere in the drying room outside the dryer, were a constant threat. One type of fire within the dryer would result in flames "belching" out of any opening at the head of the dryer air intake openings or uncovered observation ports. The Heil 105 included a number of safety devices and detection systems to prevent such fires and to minimize their potential danger. However, it was recognized by the defendant, the plaintiff and plaintiff's employer that the dryer was a potentially

dangerous piece of machinery. The operator, as indicated above, avoided being in close proximity as much as possible. Over the years, it was the practice of the operators to leave the glass off the observation port to facilitate visual inspection without the added exposure occasioned by the cleaning process. Thus, the operator would be in close proximity to the dryer head for only a few seconds to make his inspection rather than the minute or more required if he had to clean the lens. Over the course of the years Pope and Talbot's workmen had left the covers off more and more until at the time of this incident no one seemed to know where they were; that is, it appears they had been mislaid.

■ Plaintiff went to work for Pope and Talbot in 1969 as a cleanup man and in 1970 was promoted to a dryer operator. On November 19, 1972, during plaintiff's shift, there had been two fires requiring shutdown of the Heil 105 dryer. After the second fire had been extinguished and the dryer cleaned out, the dryer was started up and plaintiff, at the foreman's instruction, approached the dryer to inspect its interior. Plaintiff had never before been required to check the Heil 105 dryer and was completely unaware there had ever been a cover for the port. Immediately, as plaintiff brought his face to the open observation port to look into the dryer there was an explosion within, and plaintiff saw a blue rolling flame inside the dryer rapidly approaching the head. The flame blew out of the dryer and plaintiff was knocked down. As he immediately regained his feet and covered his burned face with his hands, there was a second explosion. Plaintiff's face, the backs of his hands, and his neck where not covered by his shirt were severely burned. His head was burned all over except for the back and his hair was set afire.

The nature of the second explosion requires some attention because of the contentions of the defendant that it was a "secondary" explosion. The uncontradicted evidence is that the dryer room left much to

[114]

be desired from a "housekeeping" standpoint. There was a heavy accumulation of dust on rafters and pipes in the room. A reasonable inference is that this dust consisted for the most part of fibers which had been released into the air by reason of faulty maintenance of equipment used in conveying the fibers and allowing accumulation of the dust by failure properly to clean the premises.

Expert opinion evidence indicated that a "secondary" explosion might occur in the dryer room outside the dryer in one of several ways resulting from flame escaping from the dryer. If there were sufficient dust particles in the air in the room when the fire escaped, they would be ignited and burn so fast as to constitute an explosion. Even if there were not sufficient particles already in the air, the "first" explosion caused as the flame leaves the head of the dryer might shake down dust from the places where it had accumulated, and this dust would then ignite and "explode." In whatever way the dust outside the dryer might ignite, its rapid burning would constitute a "secondary" explosion. Defendant contends that it would not be liable for any injuries which plaintiff suffered by reason of such a "secondary" explosion. Whether this position is well taken we need not decide because the evidence will support an inference that all of plaintiff's injuries were suffered from other than a "secondary" explosion.

Plaintiff himself testified to facts from which it could be inferred that he was injured from two successive instances of flame coming out of the dryer:

"Q. What happened what [sic] you looked into the observation hole?

"A. There was an explosion.

"Q. What did you see, what happened and what did you observe?

"A. Well, just as I looked in I saw a blue rolling flame coming out of there.

"Q. Then what?

"A. Well, when it hit the end it come [sic] out that ring on the side of the portholes and knocked me down and I got up and put my hands over my face and brushed the fire off my hair and put my hands up to my face and it blew again.[3]

"Q. How far away from the dryer were you at the time of the first fire?

"A. Well, I don't know; about (gesturing) three or four inches.

"* * * * *

"Q. Now, you talked about a second fire. How soon afterward?

"A. The second explosion; well, as long as it took me to get knocked down and stand back up.

"Q. And where did you see it come from?

"A. I didn't see that one, I heard it. I felt it.

"Q. Did you see it at that time?

"A. No.

"Q. Why couldn't you see?

"A. I had my hands over my face.

"Q. Which direction were you facing when the second explosion occurred?

"A. Right towards the dryer.

"Q. How far away from it were you?

"A. About maybe a foot and a half or two feet at that time."

That testimony taken together with plaintiff's other testimony and that of his doctor that it was the front of his face, head and neck and the backs of his hands that were burned is enough alone to support an inference that both "explosions" emanated from the dryer in front of him rather than the second being a dust explosion which would have surrounded plaintiff with flame. There is more, however, to support such an inference.

_____

[3] We shall discuss later the state of the record as to through what opening the flame came.

In addition to plaintiff's in-court testimony there is the testimony on direct examination of a witness called by defendant. One McCarthy, who investigated the incident on behalf of the state's Accident Prevention Division testified in pertinent part:

"Q. Now, in connection with that investigation, did you have occasion to talk to the plaintiff, Mr. Allen himself, and get his version of what happened?

"A. Yes sir, I talked to Mr. Allen.

"Q. Would you tell the jury what Mr. Allen said happened to him?

"* * * * *

[Witness consulted a document.]

"A. Yes sir. * * * What this form is is a form of how we record the information of the accident and in talking with Mr. Allen he stated at the time of my investigation 'the dryer blew again, which I think burned my hands the worst.'

[Colloquy between court and witness]

"A. The victim stated to me he was checking this dryer and then this thing belched out burning propane gas and knocking him down and then he said 'the dryer blew again which I think burned my hands the worst. I was wearing eyeglasses and had my hands over my face when the dryer went the second time.' "[4]

Although there was other evidence, including expert opinion evidence, that the second explosion *was* a "secondary" explosion, the plaintiff is entitled to the most favorable inference on this appeal, and for this purpose we, therefore, assume that there were two instances of flame emanating from the dryer itself that produced his injuries.

■ As mentioned in n.3, *supra,* there is some question in interpreting plaintiff's testimony as to whether the flame "belched" from the observation port or from

---

[4] Defense counsel then attempted to lead the witness into asserting that plaintiff had told the witness that the second explosion occurred outside the dryer, but the witness' answers were ambiguous and objection was sustained to the attempt to lead.

some other openings in the head of the dryer. On direct examination plaintiff seemed to be saying that the flames came from other openings, while on cross-examination he seemed to be saying that the flame came from the observation port. Were this all that is disclosed by the record, we would be at a loss to determine whether the flames emanated from the observation port or from other openings. This problem is solved by the pleadings, however, for as appears from the portions of the amended complaint quoted *supra* plaintiff alleged that the burning material came from out the dryer through the observation port, and defendant in its amended answer (filed on the morning trial commenced) admitted in pertinent part:

> "* * * Defendants admit that on or about November 19, 1972, Plaintiff was injured when fire or flame came out of the open observation port of the dryer in question."

Moreover, defendant resisted plaintiff's attempt five days before trial and another attempt on the morning trial began to amend the amended complaint to allege that the fire came from other openings. Both parties, therefore, for the purpose of this appeal are bound by their formally taken positions that the flame came through the port.

Having reviewed the pertinent pleading and evidentiary record we now turn to whether the court erred in directing the verdict for defendant on the ground that the evidence was insufficient to support either of the two specifications of unreasonably dangerous defect set forth in paragraph IV of the amended complaint quoted *supra.*

▮ Both parties direct our attention to the provisions of 2 Restatement (second) of Torts § 402A[5] and plaintiff

---

[5] "(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

further directs our attention to some particulars in which he contends we have departed from application of the provisions of § 402A. Furthermore, both parties on trial and in this court have concerned themselves with the "balancing test" criteria of design defect cases set forth in *Roach v. Kononen/Ford Motor Co.,* 269 Or 457, 464, 525 P2d 125 (1974) and in *Phillips v. Kimwood Machine Co.,* 269 Or 485, 499, 525 P2d 1033 (1974).[6] We believe that it is unnecessary, if indeed not improper, on the record in this case to conduct our analysis from that point of departure. Defendant has

"(a) the seller is engaged in the business of selling such a product, and

"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in Subsection (1) applies although

"(a) the seller has exercised all possible care in the preparation and sale of his product, and

"(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

Note that analysis need not always start with § 402A. It has sometimes been said that this court has "adopted" § 402A. This is by reason of language appearing in *Heaton v. Ford Motor Co.,* 248 Or 467, 470, 435 P2d 806 (1967). That language was used, however, to acknowledge our acceptance of premising liability on supplying a product which is "unreasonably dangerous" as distinguished from a product which is "ultrahazardous" as in *Wights v. Staff Jennings,* 241 Or 301, 405 P2d 624 (1965) on the one hand or on the other that the product was placed on the market "negligently." It should be remembered that § 402A is not a statute and that as an attempted restatement of common law it is binding upon this court only so long and in such particulars as we may find appropriate. We have already diverged from a strict § 402A approach in *Phillips v. Kimwood Machine Co.,* 269 Or 485, 525 P2d 1033 (1974). We state these remarks only because written and oral argument in cases of this nature almost invariably proceed from an unstated premise that a case must stand or fall depending upon whether § 402A has been satisfied.

[6] Speaking personally and not for the court or any member(s) thereof I find difficulty in using some of those criteria at the appellate level in this jurisdiction where this court (prior to my becoming a member) has rejected as a basis for strict products liability the concept of "enterprise liability," "entrepreneurial liability" or whatever term is properly assignable to a theory of risk allocation or risk spreading. I believe that those criteria injected into the judicial function elements properly to be considered only in a risk allocation jurisdiction. *Compare,* Polelle, "The Foreseeability Concept and Strict Products Liability: The Odd Couple of Tort Law," 8 Rutgers/Camden Law Journal 101 (1976).

[119]

contended neither below in its motion for directed verdict nor in this court that plaintiff has failed to state facts sufficient to constitute a cause of action in strict products liability. Rather defendant in both courts has contended only that plaintiff has failed to produce evidence from which a jury could find that the allegations of the amended complaint are true. Our task then becomes one of determining whether such evidence has been adduced.

■ There were two specifications of alleged defective design rendering the product unreasonably dangerous. If there was sufficient evidence to support either one it was error to direct a verdict against the plaintiff. As noted *supra* the pleadings establish that plaintiff was injured when fire or flame came out of the open observation port of the dryer. In paragraph III of the amended complaint plaintiff alleged that it was "burning propane gas, wood chips and fibers" which came out through the port. Both an expert called by plaintiff and one of the experts called by defendant opined that it was probably burning propane gas which produced the "blue rolling flame" which plaintiff saw coming at him when he first looked through the port. We find no evidence in the record that there were burning "wood chips" that emanated from the port. For the purposes of the general allegation of paragraph III it is not necessary to determine whether there was evidence to support the allegation of burning "fibers" emanating from the machine. It follows that the jury could find the allegations of paragraph III to be satisfied as to propane gas.

■ Our next consideration is whether the evidence is sufficient to permit a finding that the allegations of subparagraph IVa of the amended complaint are true.

> "The machine's design and manufacture did not permit persons attending the machine to make inspections of its internal operations except through an open observation port situated in such a fashion as to subject the observer to risk of injury from fire and

flames that might belch or backfire through the observation port inside the machine."

It is indisputable that a person attending the machine *could* have inspected the internal operations other than through an open observation port. That *could* have been accomplished by use of the glass cover. Does plaintiff thereby fail? We find he does not. There is ample evidence that if the cover had been kept on the port a workman in close proximity to the front of the machine would not have been burned by flames escaping through the port. However, there is also ample evidence that had the cover been left on, a workman required to inspect the internal operation of the dryer was arguably in as much, if not more, danger of being burned by such flames[7] while in the process of removing, cleaning and replacing the cover in order to utilize the glass lens provided with the machine as a part of the port cover. That procedure took about one minute, while looking through the uncovered port took but a few seconds. The evidence is uncontradicted that from the very start the design and manufacture of the dryer resulted in coating the inside of the glass with fiber dust during normal operation of the dryer, thus destroying transparency. Such evidence affords a basis for the trier of fact reasonably to infer that for all practical purposes the glass lens was not usable and that the design of the machine, therefore, did not permit inspection except through the open port.

The ultimate question, therefore, becomes whether the jury could find that a reasonably prudent manufacturer, charged with knowledge that the glass cover would be, or become, unusable, would in the exercise of reasonable care have sold the dryer. *Phillips v. Kimwood Machine Co., supra.* We hold that the evidence permits such a finding and the case should, therefore, have been submitted to the jury on the first allegation of defect in design.

---

[7] There was other evidence that one required to be in close proximity to the head of the dryer for any purpose, including, but not limited to, the lens cleaning process was exposed to the danger of fire coming from the head of the dryer through openings other than the port.

Having determined that there was a case for the jury on the first specification of defective design, we need not consider the sufficiency of the evidence to support the second specification, for the case must be remanded for a new trial and we don't know what the evidence to support the second specification may be upon the new trial.

One other matter deserves mention. Defendant had pleaded two affirmative defenses. The first was a claim of misuse of the product by the plaintiff, and the second was assumption of risk. Defendant's motion for a directed verdict was based not only on the claimed insufficiency of the evidence to establish the allegations of the complaint but, also, on the contention that defendant's two affirmative defenses had been established as a matter of law. As before noted the trial court granted the motion for directed verdict on the ground of the claimed insufficiency of the evidence to support the amended complaint; the trial court did not rule upon the other bases of the motion.

■ If the trial court grants a motion to take the case from the jury upon untenable grounds when the motion states alternative grounds, we ordinarily consider the other grounds to determine if the motion should have been granted upon the alternative grounds. *Compare, Mendelson v. State Farm Auto. Ins.,* 278 Or 379, 385, 563 P2d 735 (1977). If we find the motion should have been granted, we affirm despite the trial court having given the wrong reason. We decline to enter upon that inquiry in this case, however, because defendant took the position before this court that the issue of the affirmative defenses was not a proper issue on appeal and discussion thereof was unnecessary. By noting this matter we do not in any way indicate or decide either that the motion for directed verdict should or should not have been granted upon alternative bases. We merely wish to show we have not overlooked the point.

Reversed and remanded for a new trial.