Richard Eugene PRATHER and Brenda Prather, Plaintiffs-Appellants,

v.

The UPJOHN CO., Defendant, Third-Party Plaintiff, Appellee,

v.

UNITED STATES of America, Third-Party Defendant.

No. 85–3566.

United States Court of Appeals, Eleventh Circuit.

May 21, 1986.

---

See also, D.C., 585 F.Supp. 112.

Charles J. Kahn, Jr., Pensacola, Fla., for plaintiffs-appellants.

John A. Bussian, III, Miami, Fla., for defendant, third party plaintiff, appellee.

Before FAY, CLARK and NIES\*, Circuit Judges.

\* Honorable Helen W. Nies, U.S. Circuit Judge for the Federal Circuit, sitting by designation.

1. The Prathers are now divorced.

2. TDI is a highly reactive liquid isomer used in manufacturing polyurethane foam. The greatest practical hazard associated with the use of TDI arises from inhalation of its vapors. The maximum acceptable concentration of TDI vapor has been set by the Occupational Safety and Health Administration (OSHA) at 0.02 parts per million parts of air for a twenty-minute period.

   Inhalation of TDI vapors can produce severe irritation of the mucous membranes in the respiratory tract. Short exposure to concentrations of TDI vapor at or near the ceiling value has caused progressive disabling illness charac-

**PER CURIAM:**

Richard Eugene Prather and his wife Brenda (the Prathers)[1] brought this products liability action against the Upjohn Company (Upjohn). On appeal, the Prathers contend that the district court erred in granting Upjohn's motion for a directed verdict on the issue of strict liability. We affirm.

### I.

The Prathers alleged that Upjohn manufactured, sold and distributed to the United States Air Force polyurethane foam containing toluene diisocyanate (TDI)[2]. Richard Prather, during the course of his employment with the Air Force as a civilian aircraft sheet metal mechanic on the flight line at Tyndall Air Force Base in Panama City, Florida, was required to work with this foam. While burning the foam with a soldering gun, Prather was allegedly exposed to smoke and gases containing TDI.[3] Prather claimed that he suffered permanent lung damage from inhaling the TDI. Brenda Prather claimed a loss of consortium.

The evidence at trial showed that Upjohn sold its polyurethane foam exclusively to knowledgeable industrial consumers. The warnings Upjohn issued concerning the potential hazards of burning the foam were therefore designed accordingly. Upjohn warned Richard Prather's employer, the United States Air Force, of these potential

terized by breathlessness, chest discomfort and reduced pulmonary function. Massive exposure to high concentrations has caused, within minutes, irritation of the trachea and larynx and severe coughing spasms. Massive exposure may also lead to bronchitis, bronchial spasm and/or pulmonary edema.

3. Polyurethane foam sheets were used by the United States Air Force to line tool box drawers. Prather would first outline the shape of individual tools on the foam and then use a soldering gun to cut a nest in the foam material for placement of each tool. High concentrations of TDI vapor is produced when polyurethane foam is burned.

hazards through Upjohn's Technical Bulletin 107, a forty page reference guide hand delivered to various Air Force personnel. Upjohn also prepared package safety inserts that accompanied every box of polyurethane foam it shipped to the Air Force.[4]

Moreover, the United States Air Force had independent knowledge of the hazards inherent in burning polyurethane foam.[5] Despite this knowledge and Upjohn's efforts to provide the Air Force with all of Upjohn's safety information, Richard Prather was never warned of these hazards. Prather was simply told to fashion polyurethane drawer liners with a soldering gun.

The thrust of the Prather's claims was that Upjohn had a duty to warn Richard Prather of the potential hazards in exposing the polyurethane foam to heat and to instruct Prather on the proper use of the product. The Prathers contended that Upjohn breached this duty because Upjohn's warnings never got to Richard Prather on the Tyndall Air Force Base flight line. The Prathers based their claims on the theories of negligence, breach of implied warranty of merchantability, breach of implied warranty of fitness for a particular purpose, and strict products liability.

At the close of the Prathers' case, Upjohn moved for a directed verdict on the issue of strict liability and the two counts alleging breach of warranty. The United States District Court for the Northern District of Florida granted the motion and sent the case to the jury solely on the negligence theory.

The district court found no evidence to support the breach of warranty theories. And with respect to the strict liability issue, the court ruled that, under Florida law, the "failure or breach of the duty to warn or adequately warn ... no longer fall[s] within a strict liability claim." According to the court, "advanc[ing] a claim under strict liability for failure of the duty to warn or breach of a duty to adequately warn is nothing more than a negligence count stated in a different way." The district court therefore granted the motion for a directed verdict on the issue of strict liability, "recognizing that the same theory is going to be advanced on the [negligence] claim."

The district court instructed the jury solely on negligence and the jury returned a verdict in favor of Upjohn. The district court entered judgment on that verdict. The Prathers filed a motion for a new trial, complaining that the district court erred in taking the strict liability issue away from the jury.[6] The district court denied the motion. This appeal promptly followed.

## II.

The sole issue presented on appeal is whether the district court erred in present-

---

4. As of March 1, 1976, Upjohn attached three separate product safety information inserts to each box of flexible polyurethane foam. These inserts were placed in a clear plastic envelope with the words "SAFETY INFORMATION" visible through the front. The envelope was then glued to the top side of each box of the foam.

One of the safety inserts is a four page document which details the "[p]otential hazards associated with the use of isocyanates." The document cautions, in bold lettering, that "Misuse of These Materials Can Be Hazardous! Please Read!" Another safety insert is a one page warning sheet. The words "WARNING" and "AVISO" appear in bold print at the top of the form. The sheet warns that "[h]ot wire cutting of flexible polyurethane foams can generate irritating or toxic fumes and should be done under mechanical ventilation." The third safety insert is a one page information sheet on flexible polyurethane foam. The sheet contains

the warning: "Hot-wire cutting, heat sealing, hot stamping and flame laminating operations on flexible polyurethane foam should be done under adequate mechanical ventilation to remove fumes developed."

5. As early as 1965, the Air Force had investigated the potential hazards inherent in burning polyurethane foam. In 1970, the Air Force published a report on these studies. Moreover, at the time Richard Prather burned polyurethane foam at Tyndall Air Force Base, the Air Force employed over one hundred fifty bio-environmental engineers who were aware of, and also knew how to eliminate, the potential hazards of burning polyurethane foam.

6. The Prathers did not challenge and do not appeal the district court's order granting a directed verdict on the two counts alleging breach of warranty.

ing the case to the jury only under a negligence theory. The Prathers contend that a strict liability instruction also should have been given.

The district court's perception of this case, however, was not uncommon. Many courts have examined and compared the application of strict liability and negligence theories and concluded that there is sometimes little, if any, difference between the two theories in the failure to warn or inadequate warning context. *See, e.g., Flaminio v. Honda Motor Co.*, 733 F.2d 463, 467 (7th Cir.1984) (construing Wisconsin law); *Gordon v. Niagara Machine & Tool Works*, 574 F.2d 1182, 1190 (5th Cir.1978) (construing Mississippi law); *Rainbow v. Albert Elia Building Co.*, 49 A.D.2d 250, 252, 373 N.Y.S.2d 928, 930 (1975). The New York Supreme Court concluded that "[u]nder either theory, the recovery ultimately depends upon a subjective determination by the trier of the facts of what constitutes reasonable warning under all the circumstances." *Id.* at 253, 373 N.Y. S.2d at 931.

Other courts, however, have perceived a difference between the two theories in the failure to warn or inadequate warning area. *See e.g., Jackson v. Coast Paint & Lacquer Co.*, 499 F.2d 809, 812–13 (9th Cir.1974) (construing Montana Law); *Freund v. Cellofilm Properties, Inc.*, 87 N.J. 229, 240–42, 432 A.2d 925, 931 (1981); *Phillips v. Kimwood Machine Co.*, 269 Or. 485, 498, 525 P.2d 1033, 1039 (1974) (en banc). The rationale for the distinction is that "[i]n a strict liability case we are talking about the condition (dangerousness) of an article which is sold without any warning, while in negligence we are talking about the reasonableness of the manufacturer's actions in selling the article without a warning." *Id.*

The Prathers maintain that the Florida Supreme Court would align itself with those courts that recognize a difference

between negligence and strict liability theory in a failure to warn or inadequate warning case.[7] Upjohn disagrees, contending that under Florida law the two theories are identical in a failure to warn or inadequate warning case. The directed verdict on the issue of strict liability, according to Upjohn, was therefore proper.

In agreeing that the directed verdict was indeed proper, we need not decide whether the Florida Supreme Court would treat negligence and strict liability as identical theories in the context of this case. Even were we to accept the Prathers' representations concerning Florida law, we would still find it necessary to affirm the district court's order granting Upjohn's motion for a directed verdict in that the Prathers failed to offer sufficient evidence to withstand the motion.

The standard for reviewing the sufficiency of the evidence following a motion for directed verdict is well established. *Worsham v. A.H. Robins Co.*, 734 F.2d 676, 680–81 (11th Cir.1984). All of the evidence must be considered "in the light and with all reasonable inferences most favorable to the party opposed to the motion." *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir.1969) (en banc).[8] Granting the motion is proper if the evidence points so strongly in the movant's favor that reasonable men could not arrive at a contrary verdict. *Id.* On the other hand, the motion should be denied if the record contains evidence of such quality and weight that reasonable and impartial men might reach different conclusions. *Id.* Thus, "[a] mere scintilla of evidence is insufficient to present a question for the jury." *Id.*

Here, the Prathers failed to present sufficient evidence to support their strict liability claim. Under Florida law, to hold Upjohn liable on the theory of strict liability, the Prathers were required to establish Upjohn's "relationship to the product in question, the defect and unreasonably danger-

---

7. *See Erie Railroad v. Tompkins*, 304 U.S. 64, 73, 58 S.Ct. 817, 819, 82 L.Ed. 1188 (1938) ("Federal courts exercising jurisdiction in diversity of citizenship cases [must] apply as their rules of decision the law of the State....").

8. The Eleventh Circuit, in *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

ous condition of the product, and the existence of the proximate causal connection between such condition and the user's injuries or damages." *West v. Caterpillar Tractor Co.*, 336 So.2d 80, 87 (Fla.1976). The Prathers neglected to establish that Upjohn's polyurethane foam was in a defective and unreasonably dangerous condition.

The Prathers' chief complaint is that a reasonable jury could have found Upjohn's polyurethane foam to be defective because Richard Prather, the ultimate user, was never warned of the potential hazards involved in burning the foam. The Prathers do not suggest that Upjohn's warnings were inadequate;[9] what the Prathers do suggest is that Upjohn's warnings should have been stapled to the foam or placed on the foam in such a position that the ultimate user would be likely to see the warnings. There is, however, no evidence in the record to support the Prathers' suggestion.

The Prathers offered no evidence to establish that Upjohn's warnings reasonably could have been stapled to the foam. The experts testifying on behalf of the Prathers did not mention that the Prathers' suggested method of applying the warnings to the foam was feasible or more likely to reach the ultimate user than Upjohn's practice of placing the warnings on the boxes containing the foam. In fact, the evidence established that the Prathers' suggestion was not feasible.[10] The jury found that Upjohn acted reasonably in placing the warnings on the boxes containing the foam and relying upon the Air Force to pass the warnings on to Richard Prather. In the absence of any evidence to the contrary, a reasonable jury could not have found that the foam was in a defective and unreasonably dangerous condition.

### III.

We hold that the evidence adduced at trial, even viewed in the light and with all reasonable inferences most favorable to the Prathers, was insufficient to establish that Upjohn's polyurethane foam was in a defective and unreasonably dangerous condition. We therefore need not now decide how the Florida Supreme Court would treat strict liability and negligence theories in a failure to warn or inadequate warning case.

The district court's directed verdict on the issue of strict liability is

AFFIRMED.

---

9. In fact, the evidence adduced at trial establishes that Upjohn's warnings were more than adequate. For example, Byung K. Kwon, an industrial hygienist employed by OSHA and the National Medical Advisory Service, testified that the safety inserts "contain all of the information necessary." Kwon also testified that Upjohn's Technical Bulletin 107 "contains the most comprehensive technical information as to the toxicity hazards and methods of controlling the hazards in any document you can find.... It's a very good document." No contradictory evidence was presented.

10. Robert E. White, a shipping clerk with Upjohn, testified on behalf of Upjohn. In Mr. White's opinion, attaching the warnings to the foam "wasn't feasible, because if you would have used any kind of staple on a government order of one-inch foam, if you would have fastened it on there with a staple, and the safety instruction would have been pulled off, it would have been reject[ed]." Mr. White also added: "It would have ruined the sheet."