Argued April 3, reversed and remanded with instructions
April 17, 1975

## WILLIAMS, *Respondent, v.* LAURENCE-DAVID, INC., *Appellant.*

534 P2d 173

*Edward H. Warren,* Portland, argued the cause and filed a brief for appellant. With him on the brief were Hershiser, Mitchell & Warren, Portland.

*Raymond R. Bagley, Jr.,* Oregon City, argued the cause and filed the brief for respondent. With him on the brief were Jack, Goodwin & Urbigkeit, Oregon City.

TONGUE, J.

This is an action for personal injuries allegedly sustained as a result of contact dermatitis from an allergic reaction to rubber gloves supplied by the defendant to plaintiff's employer. The case was tried before a jury, which returned a verdict in favor of the defendant. The trial court then entered an order allowing plaintiff's motion for a new trial. Defendant appeals.

Plaintiff had worked in the plywood industry as a "spreaderman" for 18 years. During that time he, like other "spreadermen," had used rubber gloves of

the kind sold by defendant to protect his hands from plywood glue and slivers. He testified that prior to 1971 he never had any "problem with dermatitis," although he previously had "rash" and "minor irritations," which he attributed to slivers.

He started working for Milwaukie Plywood Company in April 1971. He testified that he usually wore a short sleeve shirt and wore rubber gloves with cotton "liner" gloves. He also testified that in June he started having problems with dermatitis, with swollen wrists and a rash and itching from his wrist to his elbows. In August he went to see Dr. Chenoweth, who gave him some "salve." The medical records of Dr. Chenoweth, which were received in evidence over plaintiff's objections, stated as the diagnosis: "Contact dermatitis—wrists—probably from plywood glue" and also stated, under "remarks" that "patient was to bring in a sample of glue for patch testing and did not return for follow-up visit on August 23rd." Dr. Chenoweth was deceased at the time of trial.

Plaintiff denied that he was told by Dr. Chenoweth that his problem was related to glue poisoning and didn't remember whether he was asked to "come back with a glue sample for a patch test."

In November 1971 plaintiff quit work at Milwaukie Plywood Company and went to work for another plywood company, where he continued to use rubber gloves with the same brand insignia on the wrapper as the kind used by him while working at Milwaukie Plywood Company, but with a thin plastic liner. He had no additional problem with dermatitis.

In August 1972 plaintiff went to see another doctor, Dr. Dahl, because of the loss of pigmentation of the skin on his arms. Dr. Dahl performed a "patch test" on plaintiff, using rubber gloves that he brought in, resulting in a negative reaction, showing that

plaintiff was not sensitive to those gloves. The gloves used for that test were the same, or the same type, as used for a test on a Mr. Krall, an employee of Milwaukie Plywood Company and a patient of Dr. Dahl, resulting in a positive reaction. Dr. Dahl concluded that the loss of pigmentation on plaintiff's arms was due to some secondary infection, which "usually follows in severe inflamation of the skin. Not in all individuals, but some patients have it."

A year later, in August 1973, plaintiff and Mr. Krall went to see a third doctor, Dr. Kingery, who also conducted patch tests, using a rubber glove and a glue sample brought to him by Mr. Krall. The result as to plaintiff was a "significant reaction" to the rubber glove and a "significantly negative reaction" to the glue.

Dr. Kingery testified that in his opinion plaintiff had "suffered a contact dermatitis as a result of the use of the rubber gloves." He also concluded that the loss of pigmentation was due to a secondary infection.

Shortly before trial in February 1974 Dr. Kingery again examined plaintiff. He testified that plaintiff was then wearing gloves to which he was not sensitive, but was exposed to wood slivers, and "had just up and down his forearm * * * a number of slivers," and was then "having a source of irritation * * * unrelated to the prior problems with the gloves."

Dr. Kingery also testified that it was "reasonable to assume" as a matter of "medical probabilities" that the secondary infection was caused by the contact dermatitis and that "of the various explanations * * * an infection would offer the best logical explanation" for the loss of pigmentation.

When asked whether he would disagree that there were "other possible causations to this infection

and the resulted depigmentation other than dermatitis," Dr. Kingery said, "No, I wouldn't. I didn't see the infection and I really didn't see the dermatitis * * *," but that "of the options available," it was "most likely that [the depigmentation] resulted from the earlier dermatitis with the glove."

Dr. Kingery also said:

"I can't be sure there. Infection, the areas of the scarring and depigmentation do not necessarily correspond with the area directly exposed to the gloves. The thing that makes me suspicious of a secondary infection to the allergic contact dermatitis is a time relationship more than anything else."

Dr. Kingery was also asked whether plaintiff was a hyper-allergic person and responded as follows:

"Only in the fact he has demonstrated the capacity to react to a rubber glove and the fact that he also at the time of the last examination had considerable reaction, which I presume might be due to one of the products in the—one of the forest products because he gets a lot of slivers and these seem to irritate his skin quite a bit on the abdomen or of the forearms."

In addition to this medical testimony, plaintiff offered the testimony of five other employees of Milwaukie Plywood Company who testified that they had similar problems with their arms after using rubber gloves provided by their employer with the same brand insignia on the wrappers. One of these employees, Dennis Krall, had previously obtained a jury verdict for damages as the result of an action against defendant, but plaintiff was not permitted to offer the record in that case in support of his contention that defendant was collaterally estopped by that judgment to deny its liability to him.

Mr. Krall also testified on cross-examination that

to protect his skin from coming in contact with glue and also from splinters he generally wore long sleeve shirts, instead of short sleeve shirts, as usually worn by plaintiff.

Defendant's president testified that defendant had been selling rubber gloves of this brand and also glove liners since 1964 to approximately 200 companies in 20 states and in Canada, including Milwaukie Plywood Company; that such gloves are used by workmen in plywood mills who are exposed to plywood glue and splinters, and that during those years he was aware of only five or six complaints about the gloves, including allergic reactions. He admitted that rubber gloves are a common cause of allergic reaction and that no warning was given that the use of such gloves may cause such reaction. He testified, however, that the liner was sold to prevent contact of the rubber gloves with the skin.

■■ Plaintiff's motion for new trial was based upon several grounds. We recognize that the allowance by the trial court of plaintiff's motion for a new trial must be affirmed if any of the grounds for that motion are well taken. *Highway Commission v. Fisch-Or,* 241 Or 412, 418, 399 P2d 1011, 406 P2d 539 (1965). On the other hand, the trial court may properly order a new trial only where there is a basis for a finding of substantial prejudicial error. *McIntosh v. Lawrance,* 255 Or 569, 572, 469 P2d 628 (1970).

1. *The records of Dr. Chenoweth were admissible under ORS 41.860.*

The ground on which the trial court relied in ordering a new trial was that it was error to admit the medical records of Dr. Chenoweth. That ground for plaintiff's motion for a new trial was as follows:

"(c) The Court erroneously admitted defendant's Exhibits A and C containing certain notes

and a report by Dr. Chenoweth. Said exhibits constituted an improperly expressed opinion without opportunity for plaintiff to cross-examine the expressor of the opinion and were not properly authenticated as business records."

■ In sustaining that ground of plaintiff's motion the trial judge recognized that it might not violate the rule against hearsay evidence to admit these records, but said that "a great deal of that exhibit is not subject to accurate interpretation" and that "it was very difficult to know what the jury might divine out of the unintelligible portions * * *." The trial judge also said that he did not "feel that the statute [ORS 41.860] is intended to cover the problem that we have here either."

We have examined the records of Dr. Chenoweth, one page of which consisted of a printed form with various items and blank spaces, in which various statements were typed, including the diagnosis of the doctor, and another page, which consisted largely of handwritten notes by the doctor. Although some of the words in those notations are difficult to read, others are quite legible. Upon examining these notes, however, we do not believe that any words that may have been difficult to read could have resulted in any misunderstanding by the jury or prejudice to the plaintiff. Moreover, plaintiff's motion for a new trial was not based upon the illegibility of the records.

■ As to the more fundamental question whether the records were inadmissible as hearsay, or as business records which were not properly authenticated, we hold that these records were admissible under ORS 41.860, which provides:

"*Entries of deceased persons or persons without the state.* Entries or other writings of like character of a person deceased or without the state, made at or near the time of the transaction and in

a position to know the facts stated therein, may be read as primary evidence of those facts when it was made:

"* * * * *

"(2) In a professional capacity, and in the ordinary course of professional conduct; * * *

"* * * * * *"

Plaintiff does not deny that these records were made by Dr. Chenoweth, since deceased, at or near the time of his examination of the plaintiff or that he was then in a position to know the facts stated in such records or that such records were made by him in a professional capacity and in the ordinary course of professional conduct as a doctor. Neither did plaintiff object upon the ground that the records themselves were offered in evidence, rather than "read," as provided by the statute.

■ It follows, in our opinion, that these records were admissible under the exception to the hearsay rule provided by ORS 41.860. This being so, they were admissible despite the fact that they included statements of opinion. Indeed, testimony or records which qualify under other exceptions to the hearsay rule are also admissible despite the fact that they include opinions which are not subject to cross-examination. See, e.g., *Swain v. Oregon Motor Stages,* 160 Or 1, 6, 82 P2d 1084, 118 ALR 1225 (1938). See also McCormick on Evidence 2d 41, 632, 683 (1972). This includes statements of diagnosis in hospital records, at least in the absence of specific objection to notations of diagnosis at the time of the offer of such records in evidence. *McReynolds v. Howland,* 218 Or 566, 573-74, 346 P2d 127 (1959); *Gallagher v. Portland Traction Co.,* 181 Or 385, 392, 182 P2d 354 (1947). See also McCormick, *supra,* 721, 732.

ORS 41.860(2), by its terms, makes express refer-

ence to entries in records and other writings made "in a professional capacity, and in the ordinary course of professional conduct * * *." Such entries and writings by professonal persons such as doctors normally include statements of opinion. No provisions are included in ORS 41.860 conferring discretion upon the court, as in ORS 41.690, relating to business records.

■ The terms of ORS 41.860(2) are clear and unambiguous and we do not believe that the court can properly interpret that statute in such a manner as to hold that the legislature intended to exclude statements of opinion from its application.

■ It follows that the office records of Dr. Chenoweth relating to his examination of the plaintiff were properly admitted in evidence on offer by the defendant and that it was error for the trial court to subsequently order a new trial on the ground that these records were inadmissible. Because we hold that such records were admissible by reason of ORS 41.860 we need not consider defendant's further contention that such records were also admissible upon the ground that they satisfy the more general requirements for recognition of exceptions to the hearsay rule. See *Timber Access Ind. v. U.S. Plywood,* 263 Or 509, 521-22, 503 P2d 482 (1972), and *State v. Derryberry,* 270 Or 482, 528 P2d 1034 (1974).

2. *There was no collateral estoppel.*

Plaintiff also contends that the trial court erred in sustaining defendant's demurrer to his supplemental complaint in which plaintiff alleged that a judgment of damages for personal injuries had previously been entered in favor of Dennis Krall, also an employee of Milwaukie Plywood Company, against this same defendant and that:

"Plaintiff in said case made the same claims as to liability and said case involved facts identical

to the instant case with respect to the liability of defendant. Defendant had a full and fair opportunity to litigate its liability in said case. By entry of judgment therein, the court necessarily determined that defendant was either negligent or strictly liable for all injuries and damages proximately caused by its supplying of defective gloves. Defendant is collaterally estopped to deny its liability in this case."

In *Bahler v. Fletcher*, 257 Or 1, 474 P2d 329 (1970), this court abandoned the doctrine of mutuality as a requirement for application of the rule of collateral estoppel by judgment. In that case the court also declined to adopt the distinction recognized by some courts under which defendent, but not plaintiff, could seek the application of that rule and recognized that it may properly be applied on behalf of "multiple claimants" against a single defendant, as when many persons are killed in a single airplane crash. We said, however (at 18), that:

"* * * [C]ollateral estoppel should not be used in the multiple claimant anomaly situation when unfairness would result. * * *"

and (at 19-20) that:

"* * * [M]any reasons revolving around other policy considerations militate against giving carte blanche permission to bar relitigation of issues previously decided to persons who were neither a party nor in privity with a party to the original litigation when subsequently litigating with one who was. Courts, therefore, should scrutinize with care any situation where collateral estoppel is asserted by a person who was neither a party nor in privity with a party to the first case, to make certain no unfairness will result to the prior litigant if the estoppel is applied. Where no unfairness would result, a party to the first litigation should be bound in subsequent litigation with third parties by issues necessarily decided in the orig-

inal case. Because of the general policy against relitigation and because it is presumed that all parties to a case have an equal opportunity to litigate an issue, prima facie the first judgment should be conclusive. * * *"

We also quoted (at 20) with approval from another case, as follows:

" '* * * There must be an identity of issue which has necessarily been decided in the prior action and is decisive of the present action, and, second, there must have been a full and fair opportunity to contest the decision now said to be controlling.' * * *"

In this case there was testimony that Mr. Krall wore rubber gloves bearing the same brand insignia as those worn by plaintiff. There was no evidence, however, that the gloves worn by him were identical with those worn by the plaintiff or that they came from the same carton or case lot. There was evidence that upon examination by Dr. Dahl of both Mr. Krall and plaintiff by "patch test" from the same rubber glove there was a positive reaction from Mr. Krall, but a negative reaction for plaintiff. There was also testimony that plaintiff wore short sleeved shirts and had skin "rash" from slivers, while there was no such evidence with respect to Mr. Krall. In addition, as previously noted, there was evidence that plaintiff's contact dermatitis was "probably from plywood glue."

Under these circumstances, and aside from the question whether the issue of liability in this case is "identical" with that presented in the *Krall* case, we conclude that the facts and circumstances in this case were such that "unfairness would result" from the application of the rule of collateral estoppel. Indeed, we believe that under the facts and circumstances the jury could reasonably find in favor of defendant despite the fact that another jury found in favor of

Mr. Krall in his action against this same defendant.[①]

3. *There was substantial evidence to support the verdict.*

■ A further ground urged by plaintiff's motion for a new trial was that the evidence was insufficient to support the verdict for defendant and that the court erred in denying plaintiff's motion for a directed verdict.

This is a case that could have been decided either way by the jury, depending upon what testimony it believed and upon what inferences were drawn by it from such testimony. After reviewing the entire record, however, we believe that the evidence was sufficient to support the verdict for the defendant and that the trial court properly denied that motion.

4. *The instructions to the jury were not improper.*

The remaining grounds for plaintiff's motion for a new trial involve instructions to the jury. We have examined the instructions complained of and hold that the instructions, when considered as a whole, were

---

[①] This is in accord with the following observations by the trial judge in refusing to apply the rule of collateral estoppel in this case:

"* * * * *

"What we are here concerned with is the question of whether or not a given individual did react physically to the use of a product which in this case is gloves, is a matter of fact one—we must recognize one individual might have an adverse reaction whereas another individual might not. This isn't like a situation where you have an automobile accident. There is one set of facts that creates the damage and the injury.

"Obviously these two people weren't wearing the same pair of gloves at the same time and maybe not under the same conditions. At least conceivably there may well be and probably are different factors involved which would give rise to different reactions and I feel that this is one of those situations that falls within the gamut of Justice Holman's indication that the rule of collateral estoppel should not be applied without some reference to the best justice of the case."

fair and were not misleading. We also hold that there was sufficient evidence to support the giving of the instructions complained of. Accordingly, we hold, as did the trial judge, that these instructions were not improper.

Finding, as we do, that there was no prejudicial error in the trial of this case, it follows that the trial court could not properly allow plaintiff's motion for a new trial. Accordingly, the order for a new trial must be reversed and this case must be remanded for entry of a judgment on the verdict in favor of the defendant.