Argued and submitted January 9, affirmed October 31, 1984, reconsideration denied
January 11, petition for review allowed February 6, 1985 (298 Or 704)
See 300 Or 24, 706 P2d 929 (1985)

EWEN,
*Respondent,*

*v.*

McLEAN TRUCKING COMPANY et al,
*Defendants,*

*and*

INTERNATIONAL HARVESTER COMPANY,
*Appellant.*

(A8004-01826; CA A25947)

689 P2d 1309

E. Joseph Dean, Portland, argued the cause for appellant. With him on the briefs were Charles F. Adams and Joyce M. Bernheim, Portland.

Charles J. Merten, Portland, argued the cause for respondent. With him on the brief were Karen L. Fink, Richard S. Yugler, and Merten & Fink, Portland.

Before Joseph, Presiding Judge, and Van Hoomissen and Young, Judges.

YOUNG, J.

## YOUNG, J.

In this personal injury action, plaintiff sought damages for injuries sustained by his ward when she was struck by a truck. The truck was manufactured by defendant International Harvester Company (I.H.), owned by defendant McLean Trucking Company (McLean Trucking) and driven by defendant James Owens, a McLean employe. Plaintiff alleged negligence against McLean Trucking and Owens and a strict products liability claim against I.H. for an alleged design defect. The jury apportioned fault to plaintiff of 25%, to defendants Owens and McLean of 25%, and to I.H. of 30%.[1] I.H. appeals, raising numerous assignments of error; we affirm.

On September 10, 1979, plaintiff's ward, Mrs. Ewen, a 75-year-old woman, and a friend, a Mr. Swarner, were preparing to walk westward across southwest Fourth Avenue (Fourth) from the southeast corner of the intersection at southwest Alder Street (Alder). Defendant Owens was driving north on Fourth in the center lane of three lanes on the one-way street. Owens was driving an I.H. Transtar tractor and trailer. He approached the Fourth and Alder intersection and stopped for a red light. The truck's front tires were over at least one of the pedestrian crosswalk lines. Owens saw Ewen and Swarner to his right standing on the southeast corner of the intersection. She was facing east, and Swarner, who was holding his hands out to her, faced west. It appeared to Owens that Swarner was pulling her toward the east curb and that they were heading east, away from him. After Owens saw Ewen and Swarner to his right, he checked the traffic light, which was still red, and looked to his left, westward down Alder Street. He looked again at the light, which had turned green, and then looked to the left and to the right; seeing no one, he started forward.

In the meantime, as Owens was looking left, Ewen and Swarner started to cross Fourth from east to west. She is

---

[1] The jury was instructed, pursuant to *Sandford v. Chev. Div. Gen. Motors,* 292 Or 590, 642 P2d 624 (1982), to determine each party's fault measured against a norm governing that party's conduct. The parties stipulated that the trial court would convert each party's fault into percentages. The trial court determined the following percentages: plaintiff - 31.25 percent; Owen/McLean - 31.25 percent; and I.H. - 37.50 percent.

elderly and has Parkinson's Disease, so they moved slowly. Because the truck was encroaching on the crosswalk, they moved to the north, toward the middle of the intersection, in order to get around the front of the truck. When the light turned green on Fourth, Ewen and Swarner were somewhere near the front of the truck. Owens did not see them and, as the truck pulled forward, it struck them, injuring Ewen and killing Swarner.

We first review I.H.'s contention that the trial court erred in refusing to withdraw from the jury, or direct a verdict against plaintiff's allegations of defect concerning right-side visibility. Plaintiff's sixth amended complaint alleged:

"XIX.

"* * * * *

"3. Said truck was unreasonably dangerous and defective for use by reason of a defective design in that it had an obstructed and limited vision which prevented the driver from seeing pedestrian traffic to the immediate front and also to the right of the truck."

I.H. contends that there was insufficient evidence to permit the jury to infer that a visibility window in the passenger door or a convex mirror would have improved right-side visibility and prevented plaintiff's injury.

In order to submit a product liability claim to a jury, there must be sufficient evidence to show a causal relationship between the alleged defect and the accident. *O'Lander v. Int. Harvester Co.,* 260 Or 383, 391, 490 P2d 1002 (1971). I.H. essentially argues that the evidence shows that, although Ewen and Swarner approached the passenger door from the right and went around the side of the truck to the front, Owens, after seeing them at the curb on the right side, looked over to his left without looking back, straight ahead or to the right until after the light on Fourth had turned green. Therefore, when Owens turned to look to the right, Ewen and Swarner could not have been seen because they were already in front of the truck. Although this may be a reasonable interpretation of the evidence, it is not a construction most favorable to the plaintiff. Plaintiff's witness, Ivory, testified that Ewen and Swarner were in front of the right front side of the truck when it moved forward. In fact, defendant's exhibit, drawn by Ivory on cross-examination, placed Ewen and

Swarner directly in front of the right front tire when the truck pulled forward. Additionally, Owens testifed that *after* he had looked to the right, but before he had moved the truck forward, he had to let off the brake, push in the clutch and engage the gear. The jury could reasonably have inferred that, because of the time involved in these motions, Ewen and Swarner were even further east in the crosswalk than where Ivory placed them and that a convex mirror or a visibility window in the passenger door would have allowed Owens to see them. Although other witnesses testified that Ewen and Swarner were in front of the left front side of the truck, in considering the trial court's denial of defendant's motion for a directed verdict, we resolve evidentiary conflicts in plaintiff's favor. *Bixler v. First National Bank of Oregon,* 49 Or App 195, 619 P2d 895 (1980).

■ ■ The next assignment of error is that the trial court erred in refusing to strike plaintiff's claim of defective design due to limited forward vision and to direct a verdict against that claim. I.H. asserts that the evidence showed "as a physical fact" that the pedestrians would have been visible had the driver looked. We disagree. The "physical facts" rule is that "a verdict or finding cannot be based on evidence which is opposed to established facts." *Van Zandt v. Goodman et al,* 181 Or 80, 93, 179 P2d 724 (1947). The testimony regarding both what Owens could see and where the parties were at the time the truck moved forward were vigorously contested. For example, the testimony of police officer Sloan, who is 6'5" tall, was that, at the scene of the accident, after the truck had been moved to the curb, he took the driver's position in the cab and that officer Herder, who is 6'1" tall, walked back and forth in front of the truck. Sloan testified that Herder had to be approximately three feet in front of the truck before he could be seen.

■ I.H. next contends that the jury should have been instructed to determine and compare any fault of Swarner, a non-party. I.H.'s requested instruction provided:

"In order to obtain a proper assessment of the total amount of the Plaintiff's contributory negligence under comparative fault, it must be determined in relation to all of the parties whose fault contributed to the accident, not merely those who are named as Defendants in this litigation. Consequently, if you find that Plaintiff's ward was relying upon

John Swarner to assist her across the street, that Swarner acted negligently when providing assistance, and that Swarner's negligence was a cause of injury to Plaintiff, you should include Swarner's negligence when comparing the fault of all those whose conduct contributed to Plaintiff's injury. You should consider and compare Swarner's conduct only if you find that his acts were both negligent and a substantial factor in Plaintiff's injury."

ORS 18.480 provides:

"(1) When requested by any party the trier of fact shall answer special questions indicating:

"* * * * *

"(b) The degree of each party's fault expressed as a percentage of the total fault attributable to all parties represented in the action."

*See also* ORS 18.470. Swarner is not a party to the action; neither do the pleadings place his alleged fault in issue. There is no error.

■ Next, we consider I.H.'s argument that the trial court erred in admitting testimony concerning plaintiff's emotional distress claim based upon Ewen's seeing Swarner killed. I.H. initially moved for a mistrial, then, after plaintiff's opening argument, alternatively moved for a limiting instruction. At that time the trial court stated: "If [Ewen] saw [Swarner] killed and this occurred at the accident and she had nightmares of the event, including the trauma to herself * * * it is an item of compensatory damage and * * * you may * * * prove it." Further testimony relating to her observation of Swarner's death and the resulting emotional distress was elicited from plaintiff's witness, Dr. Lebray. By the end of the trial, however, the trial judge apparently had changed his mind, because he instructed the jury that no recovery could be allowed for damages allegedly based upon Ewen's knowledge of Swarner's death. I.H. concedes that the jury instruction was proper; it contends, however, that the giving of that instruction was "like trying to unring a bell."

Comparing "the most liberal rule" set forth in *Dillon v. Legg,* 68 Cal 2d 728, 69 Cal Rptr 72, 441 P2d 912 (1968), I.H. argues that no court has allowed evidence supporting an emotional-distress claim under facts similar to the present case. Oregon courts have yet to consider a *Dillon*-type case,

and there is no need to do so under these facts. In *Dillon* the California Supreme Court reversed a summary judgment and held that the plaintiff mother's claims for emotional trauma and physical injury from witnessing the death of her child as a result of the defendant's negligent operation of an automobile, alleged a sufficient *prima facie* case against the motorist.

Unlike *Dillon,* the present case involves the difficult task of separating out the emotional distress suffered by Ewen when she was seriously injured after being struck and dragged by a large truck. According to the testimony of Dr. Lebray and Ms. Cudnick, Ewen's nurse, she suffered anxiety and depression as a result of reliving the accident, including her injuries and her observation of Swarner's death. The evidence in the present case showed that Ewen's physical trauma and her observation of Swarner's fatal injury occurred simultaneously and caused anxiety and depression; those factors exacerbated her Parkinson's Disease. Under the facts of the present case it is unreasonable to compel plaintiff to prove her injury and at the same time to sift out inseparable elements of causation. The trial court's limiting instruction was sufficient. Its failure to grant a mistrial was not an abuse of discretion.

Finally, I.H. contends that the court erred when it gave the following jury instruction:

> "A product is dangerously defective when it is in a condition unreasonably dangerous to the user. Unreasonably dangerous in this context means dangerous to an extent beyond that which would be contemplated by the ordinary purchaser of this type of product in the community. Purchaser includes users and a user is anyone who may reasonably be expected to be affected by the product, such as a pedestrian."

I.H. excepted as follows:

> "And I will also except to any instruction that the strict liability standards should include language other than user or consumer, which is the language in [ORS] Chapter 30, specifically except to telling the jury that that includes the expectations of pedestrians."

I.H. argues that when the trial court instructed the jury on the expectations of a pedestrian, it improperly confused the class of persons who are protected under ORS 30.920(2)(b) with the

class of persons by whose expectation the product is to be judged.[2]

ORS 30.920(3) adopts the definition of "unreasonably dangerous" set forth in the Restatement (Second) Torts, § 402A, *comment i* (1965), which provides:

> "* * * [A product is unreasonably] dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases [the product] with the ordinary knowledge common to the community as to its characteristics."

Although this test works well in the context of manufacturing flaw defect cases, it is inadequate in design and warning defect cases. Because the proof in design and warning cases typically involves a balancing of utility and risk factors, the court in *Phillips v. Kimwood Machine Co.*, 269 Or 485, 492, 525 P2d 1033 (1974), articulated a test for "unreasonably dangerous" that focuses more directly on a manufacturer's responsibilities:

> "A dangerously defective article would be one which a reasonable person would not put into the stream of commerce *if he had knowledge of its harmful character.* The test, therefore, is whether the seller would be negligent if he sold the article *knowing of the risk involved.* Strict liability imposes what amounts to constructive knowledge of the condition of the product." (Emphasis in original; citations omitted.)

The *Phillips* court provided a jury instruction predicated on this "reasonable seller" test:

> "The law imputes to a manufacturer [supplier] knowledge of the harmful character of his product whether he actually knows of it or not. He is presumed to know of the harmful characteristics of that which he makes [supplies]. Therefore, a product is dangerously defective if it is so harmful to persons [or property] that a reasonably prudent manufacturer [supplier] with this knowledge would not have placed it on the market. 269 Or 501 n 16.

The court, however, did not view its "reasonable seller" test as substantively different from the Restatement standard:

---

[2] For a general discussion of the issues related to bystander recovery, *see* King and Neville, *The Bystander's Right Under Strict Liability Does Exist: A Call for Reform of the Restatement,* 25 St. Louis U L J 543 (1981).

"* * * [W]e feel that the two standards are the same because the seller acting reasonably would be selling the same product which a reasonable consumer believes he is purchasing. That is to say, a manufacturer who would be negligent in marketing a given product, considering its risk, would necessarily be marketing a product which fell below the reasonable expectations of consumers who purchase it. The foreseeable uses to which a product could be put would be the same in the minds of both the seller and the buyer unless one of the parties was not acting reasonably." 269 Or at 493.

We recently considered, in *Willamette Essential Oils v. Herrold & Jensen,* 68 Or App 401, 683 P2d 1374 (1984), whether, in enacting ORS 30.920, in 1979, the legislature impliedly overruled *Phillips:*

"Plaintiff contends, however, that * * * ORS 30.920 * * * requires that in all strict liability cases the test for 'unreasonably dangerous' be a consumer-oriented one as stated in Restatement (Second) Torts § 402A *comment i* (1965), rather than the 'reasonable seller' test enunciated in *Phillips.*

"* * * * *

"Given the somewhat confusing treatment of strict liability in the cases, it is difficult to conclude that ORS 30.920 did anything more than adopt section 402A and require that it be construed in accordance with the comments, which is what the courts were doing before its enactment. It is clear that the legislature did not prescribe a particular construction. * * *"

We concluded that, not only does ORS 30.920 *not* mandate the use of a consumer-oriented standard, but that the "reasonable seller" test is the preferred test in design defect cases:[3]

"The court's formulation in *Phillips* of the reasonable seller test makes sense in light of the evidence required in design defect cases, which requires subtle balancing of the cost, utility and probability of harm involved in marketing a particular product. Strict liability is not absolute liability, and because it is the seller, not the consumer, who must weigh

---

[3] We noted in *Willamette Essential Oils, supra,* 68 Or App at 404 that the:

" 'Reasonable seller' test has been employed in design defect cases in this state since 1974. *See, e.g., Baccelleri v. Hyster Co.,* 287 Or 3, 597 P2d 351 (1979); *Wilson v. Piper Aircraft Corporation,* 282 Or 61, 577 P2d 1322 (1978); *Newman v. Utility Trailer,* 278 Or 395, 564 P2d 674 (1977); *Myers v. Cessna Aircraft,* 275 Or 501, 553 P2d 355 (1976); *Harding v. Kimwood Corporation,* 275 Or 373, 551 P2d 107 (1976); *Reiger v. Toby Enterprises,* 45 Or App 679, 609 P2d 402, *rev den* 289 Or 337 (1980). * * *"

those factors in considering alternative designs, the court in *Phillips* concluded that the use of a reasonable seller test would '[preserve] the use of familiar terms and thought processes with which the courts, lawyers and jurors customarily deal.' 269 Or at 493." 68 Or App at 409.

 Despite our conclusion in *Willamette Essential Oils* that, in a products design defect case, the "reasonable seller" test is the preferred instruction, by virtue of the *Phillips* court's conclusion that "the two standards are the same," we must conclude that it is not error for a trial court to give a jury instruction based on the consumer-oriented standard of ORS 30.920. *See Willamette Essential Oils v. Herrold & Jensen, supra,* 68 Or App at 409 (Warren, J., specially concurring). Although the instruction given by the trial court in the present case equated "consumer" and "pedestrian" it was not prejudicial error. At bottom, the interchangeability of the "reasonable seller" and the "consumer-oriented" tests is predicated on the rationale that the allegedly unsafe product at issue is to be viewed by the jury as though from the perspective of a "reasonable person." *See Phillips v. Kimwood Machine Co.,* 269 Or 485, 493, 525 P2d 1033 (1974). Therefore, whether the jury is instructed to view the product from the perspective of the "reasonable manufacturer" or the "reasonable consumer" or the "reasonable pedestrian" is of little moment.[4]

---

[4] We recognize that by equating "consumer" with "pedestrian" we have done little more than implicitly acknowledge the futility of applying—as we are bound to—a consumer-oriented test in the context of a design defect case. This is not a novel conclusion. Professor Birnbaum writes:

"Even if the 'ordinary consumer' test were to be consistently defined as an objective, hypothetical construct, two additional limitations inherent in the test make it a functionally inadequate tool for formulating a rational definition of defect. First, the consumer expectations test has a built-in tendency to short-circuit the analytic process. That is, once a court determines what an ordinary consumer's expectations are, the dispostion of a case becomes rather routine. * * *

"The second inherent limitation of the consumer expectations test is the haphazard subjectivity necessarily brought to bear by the trier of fact in attempting to discern what in fact reasonable consumer expectations are. When the defect is latent and the product complicated in design (as most products now seem to be), it cannot be said with any certainty that consumers know what to expect because they usually do not know how safely the product could or should have been made. * * * How, then, can jurors charged under a consumer expectations test make a determination of whether to impose liability? In all probability, they guess. * * *

"Despite its fundamental inadequacy as a basis for theory of liability, the notion of consumer expectations as defined in comment i to section 402A is so

We find no error.[5]

Affirmed.

---

deeply imbedded in the warranty heritage underlying strict products liability that courts have generally been reluctant to eliminate it altogether from a product defect analysis. Thus, to buttress the comment i approach, some courts have fashioned a consumer expectations test with a risk-utility base. That is, in seeking to establish that a product is dangerous to an extent beyond that which the ordinary consumer would expect, the trier of fact must first determine what reasonable consumer expectations would be. Under a literal application of comment i, the trier of fact would be invited to rely on some vague commonsense notion of what the ordinary consumer expects in the way of safety. * * *

"Burdening a product defect analysis with the conceptual baggage of the hypothetical ordinary consumer adds essentially nothing of substance to a straightforward risk-utility balancing approach. While offering a deferential nod to the warranty heritage of strict products liability, the single-standard test needlessly protracts the analysis, thereby inviting confusion." Birnbaum, *Unmasking the Test for Design Defect: From Negligence [to Warranty] to Strict Liability to Negligence*, 33 Vanderbilt L Rev 593, 613-15 (1980).

For other criticisms of both consumer-oriented and seller-oriented tests, *see* Keeton, *Products Liability—Design Hazards and the Meaning of Defect,* 10 Cum L Rev 293 (1979).

[5] In I.H.'s tenth assignment of error, it contends that the trial court improperly refused to give its requested instruction concerning the financial status of the parties. The requested instruction stated that:

"The wealth or property in this case is irrelevant. Consequently, you shall not consider any party's financial condition when deciding whether or in what amount to award damages."

The trial court instructed the jury as follows:

"It's your duty to weigh the evidence, dispassionately, and to decide all issues upon their merits. Don't decide this case on the basis of bias or sympathy or prejudice, or on the basis that the two parties are corporations and that the plaintiff is an individual."

We conclude that the jury was properly instructed. I.H.'s remaining assignments of error have no merit.