Argued and submitted June 5, affirmed August 2, 1995

Freddie S. COLE,
*Respondent,*

*v.*

FORD MOTOR COMPANY,
a Delaware corporation,
and Landmark Ford, Inc.,
an Oregon corporation,
*Appellants.*

(9305-03143; CA A83939)

900 P2d 1059

Jack Faust argued the cause for appellants. On the briefs were Mildred J. Carmack, Roland F. Banks, Jr., Mitchell E. Hornecker, and Schwabe, Williamson & Wyatt.

Robert K. Udziela argued the cause for respondent. With him on the brief was Pozzi Wilson Atchison.

Before Riggs, Presiding Judge, and Landau and Leeson, Judges.

LEESON, J.

Landau, J., dissenting.

## LEESON, J.

Plaintiff brought this products liability action seeking damages for personal injuries suffered when the van in which she was a passenger crashed into a guard rail. Defendants Ford Motor Company and Landmark Ford, the van's manufacturer and seller respectively, appeal from a judgment entered after a jury awarded plaintiff $375,000. They challenge the trial court's denial of their motion for a directed verdict. Alternatively, they seek a remand for a new trial. We affirm.

On August 30, 1991, plaintiff's husband purchased a new Ford Aerostar van from Landmark. The van was equipped with a cruise control system. That system is operated by five buttons located on the van's steering wheel: "on" and "off" buttons on the left side and "set," "resume" and "coast" buttons on the right side. When the system operates properly, it is activated when the driver presses the "on" button, and is engaged when the driver accelerates the vehicle to any desired cruising speed above 35 miles per hour and then presses the "set" button. The vehicle is supposed to maintain the set speed until the driver presses the "off" or the "coast" button, or, alternatively, depresses the brake pedal. After pressing the brake, the driver can return to the previously set cruising speed by pressing the "resume" button, and need not reactivate the system by pressing the "on" button. Additionally, turning off the ignition switch deactivates a properly operating system.

A few days after purchasing the van, plaintiff and her husband drove it from their home near Hillsboro to the coast, where they spent the night. During the trip, plaintiff's husband tested the cruise control system, which properly engaged and disengaged. On September 3, 1991, on the return trip, as they were nearing home, husband pressed the brake pedal to slow down and the van "just took off wide open," accelerating through a stop sign. Husband negotiated one turn, but then crashed the van into a guard rail. The van's right front wheel was torn off and the impact crushed plaintiff's foot.

At the request of plaintiff's insurer, the damaged van was taken to Talbott Associates, Inc., a consulting engineering firm, where, on October 21, 1991, it was inspected and the

cruise control system was tested by Cronrath, a mechanical engineer, and Warrens and Brown, two experienced mechanics. Talbott was instructed to limit its inspection to a determination of whether the cruise control system was functioning properly. It was also instructed not to diagnose any malfunction it might discover. Specifically, Talbott was to avoid dismantling the system so that it would remain intact for inspection by defendants.

The van remained in storage until August 13, 1993, when it was purchased by Horne, who subsequently had it repaired and restored. The van's cruise control was tested again on March 7, 1994, by Myers, a consulting engineer for defendants. An engineer from Ford, Declercq, tested the van in early August 1994, about a week before trial.

Plaintiff's strict products liability claim, ORS 30.920, alleged in part:

"10

"The Ford Van manufactured by Ford Motor Company and sold by Landmark Ford was unreasonably dangerous and defective in one or more of the following particulars:

"a. In distributing a Ford Van with a cruise control mechanism which uncontrollably and unexpectedly accelerated.

"* * * * *

"c. In distributing a Ford Van with a malfunctioning cruise control mechanism.

"* * * * *

"e. In distributing a Ford Van with a cruise control that failed to disengage on use of the designated controls."[1]

The jury returned a general verdict for plaintiff, finding that the van was "defective in one or more of the ways alleged in plaintiff's complaint," and that one or more of the alleged defects caused the damage to plaintiff. Defendants assign error to the trial court's denial of their motion for a directed verdict, arguing that plaintiff produced "*no* evidence from which the jury could conclude that more probably than not the cruise control malfunctioned *in a way that caused the*

---

[1] Allegations in paragraphs 10b and 10d of the complaint were withdrawn and were not considered by the jury.

*sudden acceleration"* described by plaintiff. (Emphasis in original.)

■     Plaintiff and defendants disagree about our standard of review. Defendants rely on *Griffin v. K.E. McKay's Market of Coos Bay, Inc.*, 125 Or App 448, 865 P2d 1320 (1993), *rev den* 319 Or 80 (1994), contending that on review we must determine whether there was a preponderance of evidence to show causation, and that we should uphold the judgment only if "a reasonable person could draw just one inference from the evidence." *Id.* at 450-51.[2] Plaintiff argues that, as the nonmoving party, she is entitled to the benefit of every reasonable inference that may be drawn from the evidence when it is viewed in the light most favorable to her. *Faverty v. McDonald's Restaurants*, 133 Or App 514, 892 P2d 703 (1995). Plaintiff is correct.

Defendant's reliance on *Griffin* is misplaced, because in that case error was assigned to the trial court's *granting* of a motion for a directed verdict. After *denial* of a motion for a directed verdict, we cannot reverse a judgment on a jury verdict unless there is no evidence from which the jury could have found the facts necessary to support the elements of plaintiff's cause of action. *Brown v. J. C. Penney Co.*, 297 Or 695, 705, 688 P2d 811 (1984) (*citing* Or Const, Art VII (amended), § 3). We do not weigh the evidence, but consider it, including all inferences, in the light most favorable to the nonmoving party. *Id.* We resolve evidentiary conflicts in plaintiff's favor. *Ewen v. McLean Trucking Co.*, 70 Or App 595, 599, 689 P2d 1309 (1984), *rev'd on other grounds* 300 Or 24, 706 P2d 929 (1985).

■     Defendants argue that plaintiff did not show that the cruise control malfunctioned in a way that caused the accident. They concede that there was evidence from which a jury could conclude that the cruise control did not properly disengage in response to depressing the brake pedal, if in fact plaintiff had set it on the drive home from the coast. However, they claim that the evidence is undisputed that the cruise

---

[2] We note and now correct a scrivener's error in *Griffin*. It reads, "We will uphold the judgment only if a reasonable person could draw just one inference from the evidence and that inference supports the conclusion that the non-moving party was not negligent." *Id.* at 451. As is obvious from the context and citation, "non-moving party" should be "moving party."

control cannot be engaged if the ignition has been turned off since the last time the system was activated unless the "on" button is first pressed. Furthermore, they assert that there was no expert testimony to support the theory that the cruise control system could spontaneously reactivate. They contend that, because husband testified that he did not press the "on" button after having turned off the ignition at the restaurant during the return trip from the coast, the cruise control could not have engaged to cause the accident.

Although it is true that both parties' experts testified that the cruise control could not be engaged unless it was first activated by pressing the "on" button, at least three of those experts appeared to be limiting that conclusion to a properly functioning system. Defense witnesses Declercq and Myers testified unequivocally that the cruise control system could not have engaged in the manner claimed by plaintiff, and that the system operated properly when it was road tested after the van had been rebuilt by Horne. Plaintiff's witness Brown testified that, during the testing at Talbott, the functioning of the "electrical controls [was] unpredictable." Plaintiff's witness Warrens testified that the system would have to be "on" only in the sense that it was activated electrically. He explained that the buttons on the steering column operate electrically through a solid state amplifier to control the solenoids in the servo unit. The solenoids regulate the application of vacuum to a diaphragm within the servo unit that in turn operates the throttle cable. He stressed that *"normally"* the "on" button must be pushed to activate the system if the ignition has been turned off since the previous activation. However, he also testified that the intermittent problems of the cruise control system during testing indicated an electrical problem that he assumed was a malfunction in the amplifier or servo. He could not verify the nature of the problem because he had been instructed not to disassemble the system. Warrens concluded that there was a "definite malfunction of the system" that could have caused the vehicle to accelerate even "if the cruise control wasn't on at the time of the accident."

The Talbott report, which was written by Cronrath, indicated that the cruise control malfunctioned intermittently in that sometimes it could be set, but that more often

the speed of the van cycled erratically between 65 and 30 miles per hour, and that the cruise control could not consistently be disengaged by the steering column buttons or the brake pedal. According to the report:

"10.  These tests and the preliminary troubleshooting of the system indicate that defects probably exist in both the steering wheel cruise control switches and the vacuum servo unit of the cruise control. To verify the precise nature of any of these defects, additional testing and troubleshooting would need to be done.

"11.  Based on the above testing and inspections, it is most probable that the cruise control did uncontrollably accelerate the vehicle while [husband] was driving it. Based on our testing, the cruise control would most probably have had to have been in the 'on' position and the set accelerator button for the cruise control on the steering wheel would have had to have been pushed either intentionally or unintentionally while the vehicle was above 30 mph. This would not be a problem if the brake pedal switch, off switch, or coast switch worked.

"12.  The exact detailed function of all the cruise control components and their interaction with each other has not been determined, but it is possible that pushing on the brakes may have caused the vehicle to accelerate ·even harder."

At trial, Cronrath recanted a portion of that report. Specifically, he testified that he no longer thought that the rapid cycling between 65 and 30 miles per hour observed during testing demonstrated a malfunction. Subsequent to performing those tests he had learned that such behavior was not atypical when a vehicle is tested with all four wheels off the ground, as he had done with the van in this case. Nevertheless, he testified that, based on his observations, "it was probable that the system malfunctioned in the manner [husband] described."[3] Cronrath stated that he did not know the cause of the malfunction, but that the "on" button could have been stuck or that something could have been wrong with the amplifier. Additionally, he stated that his conclusion

_____

[3] This is contrary to dissent's contention that "[t]here is no testimony from any witness that the cruise control did spontaneously turn on [or] that it probably did so[.]" 136 Or App at 54.

was corroborated by his observation of a slight bluing of the metal in the van's brakes, "consistent with somebody having pushed the brake on and made a sustained effort to brake."

It is true, as defendants emphasize, that husband testified that he did not press the "on" or "set" buttons after turning off the ignition at the restaurant, and that he "didn't push any [button] either intentionally or unintentionally." However, his testimony also indicated that he was uncertain about what he did. He repeatedly stated that he did not "know for sure whether [he] actually energized it" on the way back from the coast and, at one point, even stated that "I don't remember really."

Our careful review of the record persuades us that this case could have been decided either way by the jury, and thus was not appropriate for a directed verdict. *Williams v. Laurence-David*, 271 Or 712, 724, 534 P2d 173 (1975). Much of the testimony was conflicting. Plaintiff's and defendants' experts reached different conclusions regarding the malfunctioning of the cruise control. Nevertheless, there was evidence that the buttons functioned unpredictably and that the "on" button could have been stuck. The inner workings of some components of the cruise control system, especially the electronic amplifier unit, remained unexplained, untested and of questionable reliability. Defendants concede that there was evidence, albeit disputed, that the brake pedal may not have disengaged the system. Husband's testimony indicates that his memory was not clear regarding his use of the cruise control system on the return trip. Further, his statement that he did not unintentionally activate the system cannot reasonably be taken as definitive, because people are often unaware of unintended actions.

In sum, there was evidence to support each of plaintiff's claims. The jury could reasonably have found that an intermittent electrical malfunction in the switches or amplifier caused the cruise control to uncontrollably and unexpectedly accelerate the van and cause the accident. Likewise, the jury could have found that the designated controls failed to disengage the cruise control, whether it was activated through an electrical malfunction or inadvertently by husband. Either reason, or both in combination, describes a malfunctioning cruise control mechanism as the cause of

plaintiff's injury. Therefore, the trial court did not err in denying defendants' motion for a directed verdict.

■ Defendants' request in the alternative for a new trial is predicated on the so-called "we can't tell" rule. That rule requires a new trial when a general verdict form is used for a verdict involving multiple allegations, at least one of which is not supported by any evidence, because it is not possible to determine whether the jury's verdict was based on an unsupported allegation. *Whinston v. Kaiser Foundation Hospital*, 309 Or 350, 357, 788 P2d 428 (1990). Because we have concluded that each of plaintiff's claims was supported by some evidence, the trial court did not err in denying defendants' motion for a new trial.

Affirmed.

**LANDAU, J.,** dissenting.

For plaintiff to prevail, there must be evidence either that husband turned on the cruise control or that the cruise control malfunctioned spontaneously, without having been turned on. In this case, there is no evidence that either of those events occurred, and the majority errs in reaching a contrary conclusion.

The evidence concerning whether husband turned on the cruise control comes solely from husband's own testimony. Husband testified that he did not turn on the cruise control "either intentionally or unintentionally." He later testified that "I don't remember really," and that he did not "know for sure." The words "no," "I don't know," and "I don't remember" are not a basis for concluding that husband did turn on the cruise control. Those statements are evidence that he either did not do so, or that he simply could not remember. Nothing more. As a matter of logic and common sense, the existence of a fact may not be established by a declaration that the fact did not occur. Nor, as a matter of law, may a party satisfy his or her burden of proving that fact by asking the jury simply to disbelieve contrary testimony. *Mallory v. Motor Vehicles Div.*, 20 Or App 380, 383, 531 P2d 758 (1975). The majority does not explain — and I do not understand — how a party may satisfy his or her burden by similarly asking the jury to rely on a witness who does not remember one way or the other.

The evidence concerning whether the cruise control spontaneously turned itself on is equally illusory. I have searched both the majority's opinion and the record in vain for any testimony that that is what happened. At best, there is evidence from one or more of plaintiff's experts that the vehicle "could have" spontaneously accelerated without the cruise control having been turned on. Those experts, however, could not say whether that is, in fact, what happened. There is no testimony from any witness that the cruise control did spontaneously turn on, that it probably did so or that it was even likely that it did so.[1] An expert's speculation that a fact "could have" happened is not evidence that it did happen. In *Wintersteen v. Semler*, 197 Or 601, 250 P2d 420, 255 P2d 138 (1953), for example, the court reversed a jury verdict in favor of the plaintiff in a medical malpractice action, because the plaintiff's expert testified only that the plaintiff's injuries "could have" been caused by the defendant. *Id.* at 635-36. *See also Feist v. Sears, Roebuck & Co.*, 267 Or 402, 407, 517 P2d 675 (1973); *Howerton v. Pfaff*, 246 Or 341, 346, 425 P2d 533 (1967). This case is not materially different.

Because there is no evidence from which the jury could have concluded that the cruise control was on at the time of plaintiff's accident, there is no basis for the jury's

---

[1] The majority disagrees, relying on the testimony of one of plaintiff's experts that "it was probable that the system malfunctioned in the manner [husband] described." 136 Or App at 51. The problem with the majority's reliance on that testimony is that the expert was not talking about the cruise control system spontaneously turning itself on when he made that statement. In fact, from the question put to the expert, it is clear that he was referring to the fact that, *assuming the cruise control system already was on*, the application of the brake failed to turn it off:

"Q. Now, you also made some observations about the brakes did you not?

"A. The right front brake.

"Q. And your observations were the brake — what you observed about the brake was consistent with somebody having attempted to push the brake on and made a sustained effort to brake, is that correct?

"A. It was consistent with that.

"Q. And as a scientist, you — or an engineer, you can't say that something is absolute because you weren't there; you can just say it's consistent with that?

"A. That's correct.

"Q. You did, however, conclude that it was probable that the system malfunctioned in the manner that [husband] described, didn't you?

"A. Based on those observations."

verdict that plaintiff's injuries were caused by a malfunction in the cruise control. The majority errs in failing to reverse the trial court's denial of defendant's motion for a directed verdict. Accordingly, I respectfully dissent.